******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

MARIANNA ANTONUCCI *v.* VINCENT ANTONUCCI
(AC 36842)

Sheldon, Keller and Schaller, Js.

*Argued September 21, 2015—officially released March 29, 2016*

(Appeal from Superior Court, judicial district of
Stamford-Norwalk, Shay, J.)

*Thomas M. Cassone*, for the appellant (plaintiff).

*Kevin F. Collins*, with whom, on the brief, was *Ami
Jayne Wilson*, for the appellee (defendant).

*Opinion*

KELLER, J. The plaintiff, Marianna Antonucci, appeals from the trial court's award of lump sum alimony to the defendant, Vincent Antonucci, in the context of its judgment dissolving the parties' twenty-five year marriage. The plaintiff claims that the court erred by (1) failing to enforce an agreement between the parties and the plaintiff's mother, whereby the plaintiff's mother transferred her real property (property) to the plaintiff and retained a life estate in it for herself, conditioned on the defendant waiving any claims to the property; (2) reopening the evidence sua sponte in order to allow the parties the opportunity to offer additional evidence regarding the valuation of the plaintiff's remainder interest in the property; (3) adopting the valuation of the plaintiff's remainder interest in the property proposed by one of the defendant's expert witnesses, William F. Murray, who assertedly was not qualified to appraise the value of remainder interests in residential real estate and had not used a relevant discount rate in calculating the value of the plaintiff's remainder interest in the property; and (4) failing to consider adequately the parties' current financial circumstances in awarding the defendant lump sum alimony, payable by the plaintiff in ten annual nonmodifiable installments, each equaling more than 40 percent of her annual gross income, commencing just three months from the date of the judgment of dissolution.

On the basis of our conclusion that the court erred in its analysis with respect to the enforceability of the agreement between the parties and the plaintiff's mother, and in determining the value of the plaintiff's remainder interest in the property, we reverse the judgment of the trial court, in part, with respect to its financial orders. We remand the case to the trial court for further proceedings on the issue of whether the parties' agreement with the plaintiff's mother is enforceable and for reconsideration of all financial orders.[1]

The plaintiff filed an action for dissolution of the parties' marriage on August 10, 2011. The trial initially took place over a period of four days in August, 2013. After both parties had rested, the trial court, sua sponte, on November 1, 2013, ordered the evidence reopened, indicating that, although it had accepted the methodology of the plaintiff's expert for determining the value of the plaintiff's remainder interest in the property, it believed that one of the variables in the expert's formula, the discount rate utilized by the plaintiff's expert to determine the net present value of the remainder interest, was inappropriate. The court then gave the parties an opportunity to present additional evidence on March 14, 2014, as to an appropriate discount rate. The court rendered a judgment of dissolution on March 21, 2014.

In rendering its decision, the court found the following facts: "The plaintiff . . . whose birth name was Marianna Sandolo, and the defendant . . . were married in Stamford, Connecticut, on April 10, 1988. They are the parents of two adult children . . . . The parties have been living separate and apart for approximately two years. Neither party graduated from high school, and both are currently employed. The [plaintiff] is a co-owner with her mother of a family restaurant in Stamford, and the [defendant] is a heavy equipment operator for Lee Rizzuto . . . . Both have comparable incomes of approximately $50,000 per annum, and both have, apart from a couple of relatively brief periods of unemployment by the [defendant], been steadily employed throughout the marriage. Except for some minor conditions, each enjoys generally good health. Neither claims alimony from the other.

"Throughout the marriage, the couple benefited from substantial gifts from their respective families, by far the greater coming from the [plaintiff's] parents. Remarkably, they have managed to save nothing—no safety net; no retirement accounts. While the [plaintiff] generally paid the bills, both are relatively unsophisticated when it comes to finances. Neither was able to live within their means, enabled no doubt by the generosity of the [plaintiff's] parents. They bought, improved, and sold some real properties, yet their investments had marginal returns at best. For the first ten years of marriage, and later, at the end, they lived in her parents' home. Prior to moving back with the [plaintiff's] mother, the couple [was] residing at 501 Roxbury Road, Stamford. They sold this property in June, 2007. . . . They own several automobiles between them, as well as a modest time-share in Florida.

"The principal bone of contention is the [plaintiff's] interest in the real property at 85 Doolittle Road in Stamford, formerly the residence of the [plaintiff's] parents. On November 9, 2005, following the death of the [plaintiff's] father, her mother, Filomena Sandolo, transferred her interest in the real property to her daughter by way of a quitclaim deed . . . while at the same time retaining a life estate in the property. The conveyance of the real estate was made pursuant to a certain Agreement . . . also dated November 9, 2005, signed by both parties and Filomena Sandolo, which contained the further proviso that the [defendant] waive any claims thereto, particularly in the event of a divorce. . . .

"After the death of her husband . . . Sandolo wanted to remain in her own home; however, she did not wish to live there alone. Accordingly, she asked the [defendant] and [plaintiff] if they would like to live with her again. She indicated that she would make some substantial improvements to the home if they would do so. . . . [B]oth parties agreed. [Sandolo] called her

family attorney, Joseph Pankowski, to draft certain documents and to bring them to her home. He did so on November 9, 2005.

"Each party called upon an expert to value the real estate at 85 Doolittle Road, Stamford, and the [plaintiff's] remainder interest therein. The [plaintiff's] expert, Armand V. Liguori, testified that the value of the real property and improvements as of May 14, 2013 was $1,280,000, which opinion was supported by a written appraisal . . . . For his part, the [defendant's] expert, James J. Tooher, testified that as of that date, the value of the property was $1,325,000, which was also supported by a written appraisal . . . . While the court found both witnesses credible on this point, it finds that the more reliable number is the lower number. However, in arriving at the value of the [plaintiff's] remainder interest, the experts varied in a range from $513,000 ([plaintiff's] expert) to $634,000 ([defendant's] expert). While the court finds . . . the *methodology* employed by [Liguori] to be more reliable . . . it finds that he relied upon an article published in 1998 and applied a 10 percent discount [rate], which the court finds is not reflective of the current circumstances.

"The court heard the matter over the course of five days, including final argument, and the evidence closed on August 28, 2013. However, upon further consideration, citing the case of *Mensah* v. *Mensah*[2] [145 Conn. App. 644, 75 A.3d 92 (2013)] . . . the court reopened the evidence on November 1, 2013, in order to allow the parties the opportunity to offer additional evidence regarding the discount rate to be applied in the valuation of the [plaintiff's] remainder interest. . . .[3] A further hearing was held on March 14, 2014, where the court heard the testimony of the [defendant's] expert, William Murray, as well as briefly the [plaintiff's business attorney, Jonathan Hoffman,] and her real estate appraiser . . . Liguori. Mr. Murray testified at length and submitted a written report . . . . The witness testified categorically that a 10 percent discount rate was not realistic. Basing his opinion upon a life expectancy of 11.1 years, an average rental in Stamford for a comparable property, and a combination of historical [Real Estate Investment Trust] performance return data and the applicable federal rate, he testified that the appropriate discount rate should be 3.37 percent. Applying that to the market value of the property, results in a value of the remainder [interest] of $1,103,806." (Citations omitted; emphasis in original; footnotes added.)

Before it issued its final orders, the court addressed certain questions of law. First, it determined that the plaintiff's remainder interest in the property was part of the marital estate as it was "acquired while the parties were husband and wife" and "[was] the sole significant asset in either party's name at the termination of a twenty-five year marriage."[4] The court noted that, "[i]n

family cases . . . it is the function of the court to divide the marital estate, irrespective of who holds title." The court cited General Statutes § 46b-81 (a), which states in relevant part that "[a]t the time of entering a decree annulling or dissolving a marriage or for legal separation . . . the Superior Court may assign to either spouse all or any part of the estate of the other . . . ." Further, the court concluded that the plaintiff "has a vested interest in the real property at 85 Doolittle Road . . . [and] this interest is capable of valuation at this time."

Next, the court discussed the enforceability of the agreement dated November 9, 2005, between the parties and Sandolo. Although it expressed concerns as to the agreement's legal viability, the court determined that it did not need to abrogate the agreement, deciding instead to use "alternate means to achieve an equitable resolution of this family dispute." The court concluded that, regardless of the terms of the agreement, "[s]aying that [the plaintiff's remainder interest is not part of the marital estate] does not make it so."

In issuing its final orders, however, the court found that "the portion of the agreement entered into on November 9, 2005 . . . in particular paragraph 3 thereof, relating to the [defendant's] waiver of marital and other legal rights is void as against public policy and is unenforceable against the [defendant], and is, moreover, not binding upon a court in exercising its statutory duty to subsequently dissolve the parties' marriage, award alimony, and provide for an equitable distribution of assets and other relief; and that as to the remainder of the agreement, there was sufficient mutual consideration to enforce same as between . . . Sandolo and [the plaintiff]."

The court determined that its equitable powers gave it authority to consider all the circumstances that may be appropriate for a just and equitable resolution of the marital dispute and that, although neither party sought periodic alimony, an award of lump sum alimony to the defendant was appropriate under all the circumstances.[5] In making this finding, the court took into account the statutory factors in § 46b-81, and further found that the plaintiff's vested interest in the property "will inure to the benefit of her long-term financial security . . . and that [an] award of lump sum alimony [to the defendant would] give [him a] present opportunity to provide for his long-term financial security." The court gave weight to the length of the marriage, the source of the [plaintiff's] principal asset, her remainder interest in the property, the limited education of both parties, their occupations and vocational skills, their present assets and the likelihood that neither of them would acquire significant assets in the future, and the fact that neither party made any other provision for retirement. The court also found that "throughout the marriage, until their separation, both parties . . .

made significant contributions to the acquisition, maintenance, and preservation of the family assets, including . . . improvements to . . . 85 Doolittle Road . . . ."

The court permitted the plaintiff to retain her interest in the property, subject to the existing indebtedness and the life estate of Sandolo. It ordered the plaintiff to pay the defendant, "as and for lump sum alimony, the sum of $225,000, payable as follows: On or before July 1, 2014, the [plaintiff] shall pay to the [defendant] the sum [of] $22,500, and a like sum annually on each subsequent anniversary of the first payment, until paid in full. The foregoing notwithstanding, nothing shall prevent the payment in full or in part at any earlier time, and in the event of the death of . . . Sandolo, the sale, refinance, or other transfer of the property, or any interest therein, whichever shall sooner occur, the then outstanding balance shall be due and payable in full." The court also stated, "*It is the intention of this court that this obligation shall be nonmodifiable, survive the death of either party and the remarriage or cohabitation of the* [defendant], *and that it be nontaxable to* [defendant] *and nondeductible by the* [plaintiff]."[6] (Emphasis in original.)

The plaintiff filed a motion to reargue on April 9, 2014, which was denied by the court on May 1, 2014.[7] On June 20, 2014, the court filed a correction to its decision, clarifying that it was the intention of the court that the lump sum alimony obligation be nonmodifiable, that it survive both the death of either party and the remarriage or cohabitation of the defendant, and that it be nontaxable to the defendant and nondeductible by the plaintiff. The plaintiff then filed the present appeal, and also filed a motion to articulate the court's decision as to four issues. The court addressed each request for articulation in turn. It first found that during their occupancy of the property, the defendant and the plaintiff "made actual, tangible contributions to the property, including full or partial payment of the mortgage for at least two years, installation of bathroom tile and fixtures, installation of garage doors, construction of a cinder block retaining wall . . . use of a machine to break up stone in [the] backyard, and raising of the level of the same."

The court further articulated that it did not intend that its decision abrogate the agreement of November 9, 2005, because rather than awarding the defendant a share of the property, which would likely trigger further acrimonious litigation, it awarded the entire interest in the property to the plaintiff.[8] That being the case, when it came time to consider an award of alimony, the court took into account the statutory factors set forth in General Statutes § 46b-82, including the award, if any, the court may make pursuant to § 46b-81.[9] Additional facts and procedural history will be set forth as necessary.

We begin our analysis by setting forth the relevant

standard of review and legal principles. "An appellate court will not disturb a trial court's orders in domestic relations cases unless the court has abused its discretion or it is found that it could not reasonably conclude as it did, based on the facts presented. . . . In determining whether a trial court has abused its broad discretion in domestic relations matters, we allow every reasonable presumption in favor of the correctness of its action. . . . Thus, unless the trial court applied the wrong standard of law, its decision is accorded great deference because the trial court is in an advantageous position to assess the personal factors so significant in domestic relations cases.

"Appellate review of a trial court's findings of fact is governed by the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Our deferential standard of review, however, does not extend to the court's interpretation of and application of the law to the facts. It is axiomatic that a matter of law is entitled to plenary review on appeal." (Internal quotation marks omitted.) *Fulton* v. *Fulton*, 156 Conn. App. 739, 745, 116 A.3d 311 (2015).

"[T]rial courts are empowered to deal broadly with property and its equitable division incident to dissolution proceedings." (Internal quotation marks omitted.) *Jewett* v. *Jewett*, 265 Conn. 669, 682, 830 A.2d 193 (2003). "[T]he court is required by § 46b-81 to consider the estate of each of the parties. Implicit in this requirement is the need to consider the economic value of the parties' estates. . . . In assessing the value of the assets that comprise the marital estate, the trial court functions as the trier of fact. . . . The trial court has the right to accept so much of the testimony . . . as [it] finds applicable . . . ." (Citation omitted; internal quotation marks omitted.) *McRae* v. *McRae*, 129 Conn. App. 171, 183–84, 20 A.3d 1255 (2011). "[It] arrives at [its] own conclusions by weighing the opinions of the appraisers, the claims of the parties, and [its] own general knowledge of the elements going to establish value, and then employs the most appropriate method of determining valuation." (Internal quotation marks omitted.) *Turgeon* v. *Turgeon*, 190 Conn. 269, 274, 460 A.2d 1260 (1983). In selecting and applying an appropriate valuation method, the trial court has considerable discretion. *Krafick* v. *Krafick*, 234 Conn. 783, 799–800, 663 A.2d 365 (1995). Generally, an appellate court will not overturn a trial court's division of marital property unless it "misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard. . . . As with other questions of fact, unless the determination by the trial court is clearly erroneous, it must stand." (Citation omitted;

internal quotation marks omitted.) *Bornemann* v. *Bornemann*, 245 Conn. 508, 532, 752 A.2d 978 (1998).

I

We first address the plaintiff's claim that the court erred in failing to enforce an agreement between the parties and the plaintiff's mother, Sandolo, in which Sandolo transferred her property to the plaintiff and retained a life estate in it for herself, conditioned on the defendant waiving any claims to the property.

The following additional facts are relevant to this claim. On November 9, 2005, the parties and Sandolo entered into an agreement to effectuate the transfer of a remainder interest in the property from Sandolo to the plaintiff. In this agreement, Sandolo is referred to as the "[g]rantor," and the plaintiff and the defendant are referred to as the "[g]rantee" and "the [g]rantee's [h]usband," respectively. Paragraph 1 of the agreement states, "In consideration of, and reliance upon, the [g]rantee's Husband's statement set forth in paragraph 3 hereof, the [g]rantor hereby agrees to gift and convey, and the [g]rantee hereby agrees to accept, [the property] . . . subject to the reservation by the [g]rantor of a life estate in the [p]remises."

Paragraph 3 of the agreement constitutes the defendant's claimed waiver. It reads: "In consideration of the [g]rantor's decision to gift and convey the [p]remises, the [g]rantee's [h]usband hereby relinquishes all right, title and interest which he may have in and to the [p]remises at the time of the conveyance or at any time in the future. The [g]rantee's [h]usband further declares that the [p]remises *shall at no time be considered property of he and his wife's marriage, whether or not he and his wife's marriage is at any time dissolved,* and that, if the [g]rantee predeceases him, he hereby waives his right to elect the statutory share provided in Connecticut General Statute[s] [§] 45a-436 to obtain an interest in the [p]remises." (Emphasis added.)

Paragraph 4 states, "The [g]rantee agrees to provide nutritional, health and other care-giving services to the [g]rantor during the [g]rantor and [g]rantee's mutual occupancy of the premises." The agreement does not require that Sandolo permit the plaintiff to reside in the home during the tenure of her life estate, nor does it require the plaintiff to reside in the home in exchange for the gift of the remainder interest.

In addressing the issue of whether the agreement was not enforceable on the ground that it violates public policy, the court devoted considerable discussion to why enforcement of the defendant's waiver in the agreement served "no good societal interest . . . ." The court opined that any attempt to limit the marital estate by a third party while the marriage is intact should be void, that if the agreement was intended to be a postnuptial agreement, it might not survive the

special scrutiny to be applied to such agreements, and that, with respect to the circumstances surrounding its execution, the agreement failed "the test of even the most basic right to counsel, if not a want of consideration."

The court treated the agreement as a postnuptial agreement. In so doing, it utilized the type of special scrutiny that applies to determine the enforceability of postnuptial agreements. With respect to the judicial scrutiny to which postnuptial agreements are subject, our Supreme Court has stated: "Because of the nature of the marital relationship, the spouses to a postnuptial agreement may not be as cautious in contracting with one another as they would be with prospective spouses, and they are certainly less cautious than they would be with an ordinary contracting party. With lessened caution comes greater potential for one spouse to take advantage of the other. This leads us to conclude that postnuptial agreements require stricter scrutiny than prenuptial agreements. In applying special scrutiny, a court may enforce a postnuptial agreement only if it complies with applicable contract principles, and the terms of the agreement are both fair and equitable at the time of execution and not unconscionable at the time of dissolution.

"We further hold that the terms of a postnuptial agreement are fair and equitable at the time of execution if the agreement is made voluntarily, and without any undue influence, fraud, coercion, duress or similar defect. Moreover, each spouse must be given full, fair and reasonable disclosure of the amount, character and value of property . . . and all of the financial obligations and income of the other spouse. This mandatory disclosure requirement is a result of the deeply personal marital relationship." (Footnote omitted.) *Bedrick* v. *Bedrick*, 300 Conn. 691, 703–704, 17 A.3d 17 (2011). Whether each spouse had a reasonable opportunity to confer with independent counsel is also a relevant circumstance to consider. Id., 704–705 n.6.

In an examination of the parties' intentions with respect to the agreement, the court went beyond the four corners of the agreement and considered extrinsic evidence as to the circumstances of its execution, as required by *Bedrick*.

The court found that, after the death of her husband, Sandolo wanted to remain in her own home, however, she did not wish to live there alone. Accordingly, she asked the plaintiff and the defendant if they would like to live with her again. Sandolo indicated that she would make some substantial improvements to the home if they would move back in with her. Both parties agreed to do so. Sandolo called her family attorney to draft certain documents. On November 9, 2005, the attorney brought the agreement to Sandolo's home. The court found that Sandolo's primary goal was to be able to

live in her home for the rest of her life, where her daughter would provide lifetime care, and that the plaintiff's primary interest was to obtain ultimate, unencumbered title to the property, in return for providing long-term care to Sandolo. The court found: "[B]oth [Sandolo] and [the plaintiff] have had the benefit of the bargain. A question for another time is whether or not [Sandolo] could undo the transfer, should the court void the [defendant's] waiver, or, in the alternative, grant him an interest in the property. The waiver by the [defendant] of his legal rights was secondary to that primary bargain, and while it may have been part of [Sandolo's] estate plan, it was, nevertheless, mean-spirited, or shortsighted at best, and a likely source of friction between the spouses at some point. In viewing the agreement and the circumstances surrounding its execution, it fails the test of even the most basic right to counsel, if not a want of consideration. The parties were already living under the roof at 85 Doolittle Road, and there is no evidence that they would be evicted in the absence of the [defendant's] signature, only that [Sandolo] would not make the transfer to the [plaintiff]. Moreover, although this agreement does not fall within the strict definition of a postnuptial agreement, nevertheless, it was executed during the marriage of the parties. As such, public policy would seem to dictate that it should be viewed with special scrutiny. . . . Under all the circumstances, no good societal interest is served by the enforcement of this provision.

"The foregoing notwithstanding, this court believes that the protracted, contentious, and acrimonious litigation that would very likely follow the judicial abrogation of the agreement in question, would do more harm to all the parties than good. Accordingly, the court has taken an alternate means to achieve an equitable resolution of this family dispute."[10] (Citation omitted; internal quotation marks omitted.)

Although the court expressly declined to abrogate the agreement, it failed to give effect to that portion of paragraph 3 of the agreement in which the defendant declared that in consideration of Sandolo's gift to the plaintiff, "the [p]remises shall at no time be considered property of he and his wife's marriage, whether or not he and his wife's marriage is at any time dissolved . . . ." When it decided that the remainder interest deeded to the plaintiff as a result of the agreement was "a present, vested interest . . . capable of valuation" and a "part of the marital estate for purposes of equitable distribution," the court *did* abrogate the agreement.

Thus, although the court considered the use of its equitable powers under §§ 46b-81 and 46b-82 as an alternative to deciding whether the agreement was enforceable, in treating the plaintiff's remainder interest as part of the marital estate, the court declined to enforce the promise made by the defendant to Sandolo[11] in para-

graph 3 of the agreement, which was the express consideration for Sandolo's transfer under paragraph 1.[12] After considering that the agreement the court gave the plaintiff an interest in the property with a value that should be considered part of the marital estate, the court determined that a just and equitable resolution of the dispute over a division of the property was to leave the remainder interest vested in the plaintiff and to award the defendant lump sum alimony in order to provide both parties with some future financial security. The court indicated that in arriving at its decision regarding the award of lump sum alimony and the division of marital property, the court had taken into consideration the source of the plaintiff's principal asset, the remainder interest in the property, and the present assets of each party. The court also treated the plaintiff's remainder interest as security for the defendant's lump sum alimony by ordering that, "in the event of the death of [Sandolo], the sale, refinance, or other transfer of the property, or any interest therein, whichever shall sooner occur, the then outstanding balance shall be due and payable in full."[13]

We agree with the plaintiff that the court erred when it declared that it would not decide the issue of the agreement's enforceability, but then issued a decision that resolved that issue by failing to enforce a portion of the agreement. In this respect, the court's decision is internally inconsistent. We also conclude that in refusing on public policy grounds to enforce the agreement in its entirety, the court improperly evaluated the agreement by applying the special scrutiny standard applicable to postnuptial agreements because the agreement at issue is not a postnuptial agreement.

A postnuptial agreement is an "agreement entered into during marriage to define each spouse's property rights in the event of death or divorce. The term commonly refers to an agreement between spouses during the marriage at a time when separation or divorce is not imminent." Black's Law Dictionary (9th Ed. 2009); see also *Bedrick* v. *Bedrick*, supra, 300 Conn. 702 (observing that postnuptial agreements are entered into between spouses who share relationship of mutual confidence and trust).

The agreement in question, however, is not an agreement between the plaintiff and the defendant. It includes no direct promises between the plaintiff and the defendant. It refers to Sandolo as the grantor, to the plaintiff as the grantee and to the defendant as the grantee's husband. The plaintiff's remainder interest in the property was not part of the marital estate prior to the execution and filing of the quitclaim deed contemplated in the agreement, which was delivered and recorded after the agreement was signed. On its face, the agreement unambiguously expresses that the waiver of the defendant's rights is the consideration

for the promise from Sandolo to transfer, *as a gift*, a remainder interest beneficial to the plaintiff, who was still the defendant's wife at the time the agreement was executed.

The agreement should have been analyzed in accordance with established principles of contract interpretation. "[A] contract must be construed to effectuate the intent of the parties, which is determined from the language used interpreted in the light of the situation of the parties and the circumstances connected with the transaction. . . . [T]he intent of the parties is to be ascertained by a fair and reasonable construction of the written words and . . . the language used must be accorded its common, natural, and ordinary meaning and usage where it can be sensibly applied to the subject matter of the contract. . . . Where the language of the contract is clear and unambiguous, the contract is to be given effect according to its terms. A court will not torture words to import ambiguity where the ordinary meaning leaves no room for ambiguity . . . . Similarly, any ambiguity in a contract must emanate from the language used in the contract rather than from one party's subjective perception of the terms. . . .

"[W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . When only one interpretation of a contract is possible, the court need not look outside the four corners of the contract." (Citations omitted; internal quotation marks omitted.) *Poole* v. *Waterbury*, 266 Conn. 68, 87–89, 831 A.2d 211 (2003).

In view of the language in paragraph 1, which expressly stated that the consideration for Sandolo's transfer was derived only from the defendant's waiver in paragraph 3, the agreement should have been construed as a third party beneficiary contract. In exchange for the defendant's promise of consideration, which was his waiver as contained in paragraph 3, Sandolo was induced to promise to transfer part of her interest in the property as a "gift" to the plaintiff. Although the court found that the primary consideration for Sandolo's execution of the agreement was the language contained in paragraph 4 between Sandolo and the plaintiff, in which the plaintiff promises to care for Sandolo while they mutually occupied the premises, that portion of the agreement does not even guarantee the plaintiff or the defendant a definite right to occupy the premises with Sandolo until her death, nor does the plaintiff make any promise to occupy the premises until the death of Sandolo. As a life tenant, Sandolo did not waive her right to evict the plaintiff and the defendant, and the plaintiff did not agree never to vacate the premises and live elsewhere during the period of the life tenancy. The "promise" of caregiving while the plaintiff occupied the premises, as expressed in the

contract, was an illusory one, easily avoided by Sandolo or the plaintiff. Thus, it was a token promise, and not the bargained for promise in the agreement, especially in light of the clear expressions in the agreement, on the part of Sandolo, that the conveyance to the plaintiff was intended as "gift" from Sandolo to the plaintiff.[14] We observe that, in its most basic terms, a "gift" is "the transfer of property without consideration." (Internal quotation marks omitted.) *In re Probate Appeal of Mikoshi*, 124 Conn. App. 536, 540, 5 A.3d 569 (2010).

Thus, it is more appropriate to consider the plaintiff's claim for enforceability of the agreement as a claim by a third party beneficiary, or a donee beneficiary, to enforce the benefit Sandolo and the defendant agreed would be conferred on the plaintiff—the gift of the remainder interest. Her right to enforce the agreement is not as an obligee. Her right was created by the promise between Sandolo and the defendant. It is well established in our law that "[a] third party beneficiary may enforce a contractual obligation without being in privity with the actual parties to the contract. . . . Therefore, a third party beneficiary who is not a named obligee in a given contract may sue the obligor for breach." (Footnote omitted; internal quotation marks omitted.) *Wilcox* v. *Webster Ins., Inc.*, 294 Conn. 206, 217, 982 A.2d 1053 (2009).

Having recognized the plaintiff's right to seek enforcement of the contract even though it is not a postnuptial agreement wherein the defendant and the plaintiff made any direct promises to one another, the determination of whether it is enforceable is subject to ordinary contract principles, not the special scrutiny applicable to postnuptial contracts required under *Bedrick* v. *Bedrick*, supra, 300 Conn. 703–704.

In light of the court's observations, among the issues it may choose to consider on remand is whether the contract should be declared void as against public policy on the ground that it is an agreement between a spouse and a third party that was intended at the time it was made to promote, facilitate or provide an incentive for divorce.[15] See *Gould* v. *Gould*, 261 App. Div. 733, 27 N.Y.S.2d 54 (written guarantee agreement whereby defendant guaranteed payment of monthly sums upon condition that plaintiff promptly procure a divorce from her husband was void as against public policy), leave to appeal denied, 262 App. Div. 833, 29 N.Y.S.2d 503 (1941); 7 R. Lord, Williston on Contracts (4th Ed. 2010) § 16:19, pp. 531–49 (discussing public policy arguments concerning agreements promoting or facilitating divorce). Whether a contract is against public policy is a question of law dependent on the circumstances of the particular case. "[A]s a general matter, the courts do not apply the rule of unenforceability in as absolute a fashion as the traditional statement of the rule [that contracts violative of public policy are unenforceable]

might indicate. The legal effect of contracts contrary to public policy varies with the character of the factors that cause them to be against public policy. In the criminal law, a felony is worse than a misdemeanor and the penalties vary accordingly. So it is with a contract violative of public policy. There are degrees of enforceability and thus a variety of techniques used by courts that fall short of complete enforceability but also exceed complete unenforceability." 15 G. Giesel, Corbin on Contracts (J. Perillo ed., Rev. Ed. 2003) § 79.1, p. 5.[16] When a promise or other term of an agreement is unenforceable on grounds of a public policy that is not legislatively declared, the court may determine if the interest in its enforcement is clearly outweighed in the circumstances by a public policy against the enforcement of its terms. See 2 Restatement (Second), Contracts § 178, p. 6 (1981). Courts have enforced contracts involving performances contrary to public policy when they have determined that enforcement under the particular circumstances is more just. See 15 G. Giesel, supra, § 89.1, p. 614.

"[A] decision as to enforceability is reached only after a careful balancing, in the light of all the circumstances, of the interest in the enforcement of the particular promise against the policy against the enforcement of such terms." 2 Restatement (Second), supra, § 178, comment (b), p. 8. "In some cases the contravention of public policy is so grave, as when an agreement involves a serious crime or tort, that unenforceability is plain. In other cases the contravention is so trivial that it plainly does not preclude enforcement." Id. Section 178 of the Restatement (Second) of Contracts provides in relevant part: "(2) In weighing the interest in the enforcement of a term, account is taken of (a) the parties' justified expectations, (b) any forfeiture that would result if enforcement were denied, and (c) any special public interest in the enforcement of the particular term. (3) In weighing a public policy against enforcement of a term, account is taken of (a) the strength of that policy as manifested by legislation or judicial decisions, (b) the likelihood that a refusal to enforce the term will further that policy, (c) the seriousness of any misconduct involved and the extent to which it was deliberate, and (d) the directness of the connection between that misconduct and the term." Id., § 178, pp. 6–7. On remand, prior to reconsidering the financial orders relative to the dissolution, the court should consider the agreement as a third party beneficiary contract between the defendant and Sandolo, make any factual inquiries necessary for that inquiry, and determine the extent of its enforceability accordingly.[17]

## II

We next address the plaintiff's claim that the court committed error when it reopened the evidence, sua sponte, in order to allow the parties the opportunity to

offer additional evidence regarding the valuation of the plaintiff's remainder interest in property that she owned, but in which Sandolo retained a life estate. Although we are remanding this case to the trial court for further proceedings related to the enforceability of the agreement between the parties and Sandolo, we will address the present claim related to the issue of the valuation of the plaintiff's remainder interest in the property because the types of issues involved herein may arise on remand. See *Edmond* v. *Foisey*, 111 Conn. App. 760, 773 n.14, 961 A.2d 441 (2008) (reviewing court may resolve claims that are not necessary for resolution of appeal but may arise during proceedings on remand).

The following additional facts are relevant to this claim. During the trial, the plaintiff called a real estate appraiser, Liguori, as an expert witness to testify as to the value of the property and the value of the plaintiff's remainder interest in it. The defendant called another real estate appraiser, Tooher, who testified to the same issues. Each of these appraisers employed a different methodology in placing a value on the remainder interest. On August 14, 2013, after hearing closing arguments, the court indicated to the parties that it had some serious reservations about the imperfect approach that the two real estate appraisers called by each side had taken in placing a value on the plaintiff's remainder interest. Specifically, the court stated, "I believe that . . . Liguori's approach, you know, the format that he used, is more consistent with arriving at a more accurate residuary value of [the] residuary estate.

"So, having said that, I have some serious reservations. And I think I articulated them, and I'll say it again, with regard to the discount rate. And he did say on the [witness] stand that he was aware of the fact that a high discount rate would inure toward the benefit of [the plaintiff]. . . .

"So, if his formula is okay, but the variables that he inserts in the formula are not correct, or, you know, they're one way or the other, that can skew the ultimate result.

"So, supposing I agree with you? And I agree that . . . Tooher's approach was too simplistic. But I agree with you that your expert, [Liguori], his approach was correct. But I don't believe that he used the correct discount rate. . . . What do I do as a judge?"

The court went on to indicate that it was aware of a case in New Haven, without specifying the case name, where the judge did not accept the experts' testimony and instead "went to the federal tables . . . and came up with a number. . . .

"And I, you know, [if] memory serves me, there is a floating table, [a] floating rate that the Internal Revenue [Service (IRS)] of the Department of Treasury comes out with on a regular basis. Either on a weekly or on

a monthly basis that sets the appropriate discount rate [that] could be utilized in the event of estates and trusts and [whatnot].

"So, I just throw that out to you, because, you know, the case law is very, very clear. The court does not have to believe either expert. . . .

"But I believe that the case law says that the court must find a reasonable, rational basis and articulate the basis for its decision.

"And anyway, that's one of the dilemmas that I have."

The court also referred the parties, again, to the cautionary lesson of *Mensah* v. *Mensah*, supra, 145 Conn. App. 644. See footnote 3 of this opinion.

On November 1, 2013, after both parties had rested and presented their closing arguments to the court, the court asked the parties to return to court and engaged them in a discussion on the record concerning what the court considered a "nagging problem" with respect to finalizing its decision. The court reiterated that it had a grave problem with the discount rate of 10 percent used by Liguori, the plaintiff's expert, and that it had consulted the IRS website and determined that its discount rate for May, 2013, was "something on the order of a shade under 2 percent, and that's a far cry from the 10 percent."

The court then stated, "I would like to give both of you the opportunity to come back . . . [and] plow the same ground . . . but, I mean, I would strongly suggest that both of you guys either get together and agree [on] a valuation for the remainder interest . . . or you both can go back to your experts and come up with a methodology, I mean, with a remainder [value]. . . . And . . . I'm opening the evidence for that, and you guys will have an opportunity to make your case with regard to the discount rate and the value of the remainder interest."

On that same date, both counsel agreed to report back to the court in two weeks. Neither counsel objected to the reopening of the evidence. The following colloquy then occurred between the court and the plaintiff's counsel:

"[The Plaintiff's Counsel]: Just to be clear, we're, essentially, back on trial because you're reopening the evidence?

"The Court: Absolutely. But only for this limited purpose.

"[The Plaintiff's Counsel]: I understand. For timing purposes."

On March 11, 2014, the plaintiff filed a motion to reopen evidence, seeking permission to present additional testimony from her business attorney, Hoffman, regarding the further deterioration of her financial con-

dition since the date of the last hearing. On March 14, 2014, the court heard additional evidence, which included not only new expert testimony from Murray, a certified public accountant called by the defendant who was extensively cross-examined by the plaintiff, but also additional testimony from the plaintiff's appraisal expert, Liguori, to rebut Murray's testimony. Further, Hoffman testified in support of the plaintiff's claim that her financial condition had worsened since the date that the court had last heard evidence in August, 2013. Therefore, at the plaintiff's request, the court expanded the purpose of the reopening of the evidence.

We review a trial court's decision to reopen evidence under the abuse of discretion standard. "In any ordinary situation if a trial court feels that, by inadvertence or mistake, there has been a failure to introduce available evidence upon a material issue in the case of such a nature that in its absence there is a serious danger of a miscarriage of justice, it may properly permit that evidence to be introduced at any time before the case has been decided. . . . Whether or not a trial court will permit further evidence to be offered after the close of testimony in a case is a matter resting in the sound discretion of the court.'' (Citation omitted; internal quotation marks omitted.) *Wood* v. *Bridgeport*, 216 Conn. 604, 606, 583 A.2d 124 (1990). "In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only [when] an abuse of discretion is manifest or [when] injustice appears to have been done. (Internal quotation marks omitted.) *Patino* v. *Birken Mfg. Co.*, 304 Conn. 679, 698, 41 A.3d 1013 (2012); see also *Weiss* v. *Smulders*, 313 Conn. 227, 261–62, 96 A.3d 1175 (2014) (no error for court to refuse to reopen evidence for hearing on damages under abuse of discretion standard when trial court already had ordered, sua sponte, further evidentiary proceedings after close of evidence, and party offered ample opportunity to obtain and present evidence).

In the present case, the court indicated its concern about the holding in *Mensah* v. *Mensah*, supra, 145 Conn. App. 644, in which the judgment of the trial court was reversed after it had indicated that it did not have sufficient evidence of the parties' financial circumstances, had denied a continuance to secure further documentation, and had issued financial orders as part of its dissolution judgment. See id., 653–54. In this case, having expressed reservations about the manner in which the parties' experts had calculated the value of the plaintiff's remainder interest, the only significant asset in the parties' marital estate that was in dispute, it would have been injudicious of the court to have proceeded to decide on financial orders without asking for additional evidence after having explicitly stated,

on several occasions, that it did not view the valuation evidence as persuasive evidence.[18] Proceeding in this manner only would have led to a claim of injustice by at least one of the parties and in all likelihood, in light of *Mensah*, reversal of the judgment on appeal.

This is not a situation where either party had moved for a directed verdict or a dismissal that was based upon the other party's failure to present a prima facie case, whereafter the court reopened the evidence to permit the nonmoving party to cure a deficiency called to the court's attention by the other party's motion. See *State* v. *Allen*, 205 Conn. 370, 383–85, 533 A.2d 559 (1987) (improper for motion for acquittal at close of state's evidence to result in opening of evidence, affording state another opportunity to furnish evidence essential to prove element of crime shown by defendant to have been omitted from its case-in-chief). Both parties had finished presenting their cases in full and had rested before the court reopened the evidence. To address the court's concern with respect to an issue of valuation for which neither party presented the court with persuasive evidence to guide it, each party was permitted ample opportunity, in fact, over four months, to develop a persuasive response to the court's concern, and to address it with further evidence and argument. In addition, the court permitted the plaintiff, despite having opened the evidence for the limited purpose of hearing further testimony on the value of the remainder interest, to present additional evidence as to changes in the financial circumstances of the plaintiff's restaurant business since August, 2013, the date that the trial had initially concluded. Although the defendant might have had cause to complain about the expansion of the limited purpose of the March 14, 2014 hearing, we perceive no injustice or substantial prejudice to the plaintiff in the manner in which the court conducted that hearing.

Finally, a review of the record, including the plaintiff's response to the court's proposal to reopen the evidence, reveals that the plaintiff acquiesced in the court's conducting of additional proceedings on March 14, 2014. First, the plaintiff failed to express any objection to the court's proposal to reopen the evidence. At no point did the plaintiff complain, as she does now on appeal, that the court had impermissibly "interjected itself into the debate to invite testimony to comport with information it had gleaned from its own Internet research on the IRS website, which it performed after the close of evidence,"[19] that the court had "no basis in the record [for disbelieving] both [Liguori and Tooher]," or that it was "unfair to throw a completely different matrix at the parties after they had already invested so much in the trial strategy and approach that they each freely chose with the assistance of counsel." (Emphasis omitted.)

By participating in the reopened portion of the pro-

ceedings by not only cross-examining Murray, the defendant's new expert witness, but also by recalling as a witness, Liguori, her expert appraiser; moving for permission to call a new witness, Hoffman, to testify about a different subject; and electing to present and to rely on new facts that were not previously in evidence, as testified to by both Liguori and Hoffman, the plaintiff fully acceded to the court's exercise of its authority to reopen the hearing. "If [a party] has full knowledge of improper conduct (or what he perceives to be improper procedure) he cannot remain silent, hoping for a favorable ruling, and then be heard to complain when the order is unsatisfactory." *Walsh* v. *Walsh*, 190 Conn. 126, 132, 459 A.2d 515 (1983); see generally 1 B. Holden & J. Daly, Connecticut Evidence (1988) § 12, pp. 72–89 (discussing principles of argument in context of order of testimony). "Disappointed litigants must not be encouraged to use an appeal as an opportunity to raise a claim that assaults the integrity of the trial court at its most fundamental level without having given the court, and the opposing party, an opportunity to respond. In the absence of an objection and an adequate record in the trial court, this court should not countenance such claims by reviewing them unless the record demonstrates . . . that a reasonable person would conclude that the proceeding fundamentally was unfair." (Footnote omitted.) *Wiegand* v. *Wiegand*, 129 Conn. App. 526, 543–44, 21 A.3d 489 (2011) (*Lavine, J.*, concurring). We repeatedly have expressed our disfavor "with the failure, whether because of a mistake of law, inattention or design, to object to errors occurring in the course of a trial until it is too late for them to be corrected, and thereafter, if the outcome of the trial proves unsatisfactory, with the assignment to such errors as grounds of appeal." (Internal quotation marks omitted.) *Jones* v. *Ippoliti*, 52 Conn. App. 199, 206, 727 A.2d 713 (1999).

On the basis of our review of the record, we conclude that the court acted prudently and reasonably in giving the parties an opportunity to supplement their initial expert presentations as to the value of the plaintiff's remainder interest, which it considered inadequate. Accordingly, we conclude that the court's reopening of the evidence was not an abuse of its discretion.

### III

The plaintiff's third claim is that the court erred in adopting the valuation of her remainder interest proposed by one of the defendant's experts, Murray, whom the plaintiff maintains was not qualified to appraise the value of that interest. The plaintiff makes two arguments relating to this claim, which we shall address in turn. As we reasoned with respect to the claim addressed in part II of this opinion, despite the fact that we will remand the present case to the trial court for further proceedings related to the enforceability of

the parties' agreement with Sandolo, we will resolve the present claim because the issues involved herein may arise during the proceedings on remand.

A

The plaintiff first argues that there was no basis in the record for disbelieving the testimony of either Liguori or Tooher, who, although utilizing different methods, arrived at similar valuations of the plaintiff's remainder interest. We disagree, concluding that the court had good reason not to adopt the expert valuation of either Liguori or Tooher, and did not abuse its discretion in accepting Murray's expert opinion as to the present value of the plaintiff's remainder interest.

"Whether a witness is qualified to testify as an expert is a matter that rests in the sound discretion of the trial court. . . . The role of an expert witness is to furnish the trier with special guidance drawn from his or her particular training, knowledge or experience." (Citations omitted.) *DiBella* v. *Widlitz*, 207 Conn. 194, 202, 541 A.2d 91 (1988).

"Ultimately, the determination of the value of the property [is] a matter of opinion and depend[s] on the considered judgment of the [trial court], taking into account the divergent opinions expressed by the witnesses and the claims advanced by the parties. . . . Accordingly, we review the court's findings under the highly deferential, clearly erroneous standard of review. [W]e do not examine the record to determine whether the trier of fact could have reached a conclusion other than the one reached. Rather, we focus on the conclusion of the trial court, as well as the method by which it arrived at that conclusion, to determine whether it is legally correct and factually supported. . . . A finding of fact is clearly erroneous when there is no evidence to support it . . . or when although there is evidence in the record to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Citation omitted; internal quotation marks omitted.) *Dept. of Transportation* v. *Cheriha, LLC*, 155 Conn. App. 181, 191–92, 112 A.3d 825 (2015).

The following additional facts and procedural history are relevant to this claim. The plaintiff called as her expert witness Liguori, a state licensed residential real estate appraiser. Liguori evaluated the present fair market value of the property and its improvements on the basis of comparable sales, at $1,280,000. His opinion was supported by a written appraisal report that was admitted as evidence. Relying on a 1998 article by David Keating, which was excerpted from his book, "Appraising Partial Interests," and admitted into evidence, Liguori calculated the net present value of the plaintiff's remainder interest as follows: he appraised the current fair market value of the property, applying a historical

ten year appreciation rate of residential real estate values to forecast what the fair market value of the property would be in 12.1 years. Liguori utilized 12.1 years in his calculations because he determined from a mortality table that this was the probable life expectancy of Sandolo, the holder of the life estate in the property, who was then seventy-five years old. Liguori then determined that the future fair market value of the property in 12.1 years would be $1,627,000, based upon an estimated annual appreciation rate of 2 percent. Next, applying Keating's formula, Liguori calculated the net present value of that future fair market value by utilizing a discount rate of 10 percent, which was suggested in a hypothetical scenario in Keating's article. Accordingly, he found the value of the plaintiff's remainder interest to be $513,300.[20]

The defendant called as his expert Tooher, a licensed residential real estate appraiser with twenty-eight years of experience, who had a senior real estate appraiser certificate from the American Institute of Real Estate Appraisers. Tooher testified that he had experience in appraising these kinds of interests in real estate. Tooher's written appraisal report also was submitted into evidence. Using comparable sales, Tooher found the fair market value of the property to be $1,325,000, or roughly 5 percent more than the value determined by Liguori. He then applied a "remainderman multiplier" of .47851, which he derived by inserting the age of the life tenant, Sandolo, into a chart he had found in a prior appraisal file in which he had appraised a remainder interest. Tooher multiplied the fair market value by the multiplier and appraised the value of the remainder interest at $634,000, about 20 percent higher than Liguori's appraisal. Tooher indicated that he had obtained the chart that he employed from a website on the Internet, and that it was a "well established national chart that accountants and attorneys use [called] the 'Life Estate Remainder Interest Chart.' " Tooher did not, however, identify what person or organization had published the chart. Tooher testified that he believed that the Keating method, although recommended by the appraisal institute, was too subjective and that he had avoided employing it in an effort to eliminate subjectivity.

On appeal, the plaintiff first argues that the court had no basis for rejecting the testimony of both Liguori and Tooher. We disagree. "[T]he weight to be given the evidence and the credibility of the witnesses are within the sole province of the trial court." *Stearns* v. *Stearns*, 4 Conn. App. 323, 327, 494 A.2d 595 (1985). "The credibility and the weight of expert testimony is judged by the same standard, and the trial court is privileged to adopt whatever testimony [it] reasonably believes to be credible." (Internal quotation marks omitted.) *United Technologies Corp.* v. *East Windsor*, 262 Conn. 11, 26, 807 A.2d 955 (2002). "[T]he trial judge . . . is free to accept

or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *LaBossiere* v. *Jones*, 117 Conn. App. 211, 224, 979 A.2d 522 (2009).

"[W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and . . . the whole record, those facts are clearly erroneous. . . . Although we give great deference to the findings of the trial court because of its function to weigh and interpret the evidence before it and to pass upon the credibility of witnesses . . . we will not uphold a factual determination if we are left with the definite and firm conviction that a mistake has been made. . . . In applying the clearly erroneous standard of review, [a]ppellate courts do not examine the record to determine whether the trier of fact could have reached a different conclusion. Instead, we examine the trial court's conclusion in order to determine whether it was legally correct and factually supported." (Citation omitted; internal quotation marks omitted.) *Wyszomierski* v. *Siracusa*, 290 Conn. 225, 237–38, 963 A.2d 943 (2009). "Where the trial court rejects the testimony of a plaintiff's expert, there must be some basis in the record to support the conclusion that the evidence of the [expert witness] is unworthy of belief." (Internal quotation marks omitted.) *Builders Service Corp.* v. *Planning & Zoning Commission*, 208 Conn. 267, 294, 545 A.2d 530 (1988).

In the present case, the court did not accept, and need not have accepted, the expert opinion of either Liguori or Tooher. Both of these witnesses, in the court's opinion, took shortcut approaches to the calculation process and were unable to explain how the formulas they employed had actually been derived by their appraisal industry proponents. The court commented that Tooher's approach, in which he used a vaguely identified chart, was "too simplistic."

The court further expressed concerns with respect to the high 10 percent discount rate employed by Liguori, noting that Liguori admitted in his testimony that he assumed that the plaintiff, in hiring him, had wanted a lower valuation rather than a higher one. The Keating article upon which Liguori relied, which was admitted into evidence, explains generally that "[t]he applicable discount rate is a function of the property type, market conditions and the expected date of death," but it does not explain how those factors had led to his calculation of a 10 percent discount rate. Moreover, Liguori was unable to explain to the court's satisfaction how to calculate a discount rate reflective of current circumstances, using 2013 or 2014 market conditions. Aptly, the court expressed concern that the ultimate valuation would be skewed if the variables inserted into the for-

mula were not correct.

On the basis of our review of the record, it appears that the court was willing to accept the Keating methodology of valuation advocated by Liguori, but not Liquori's application of a 10 percent discount rate. During Liguori's testimony, the court indicated that it was struggling with the use of a present value that would appreciate 10 percent every year, referring to such a yield as a "heck of a good investment." Later, the court indicated its conclusion that the 10 percent discount rate was "way off. And part of it, I believe, is because [Liguori] got his methodology, he may have got it correct, but he got it from a 1998 article, and you know, that's a few years ago, that's fifteen years ago."

In this case, we agree, on the basis of the court's findings, that the opinions of Liguori and Tooher were predicated on "uncertainties in the essential facts . . . such as to make [their opinions] . . . without substantial value." (Internal quotation marks omitted.) *Wyszomierski* v. *Siracusa*, supra, 290 Conn. 244. Accordingly, we do not deem clearly erroneous the court's rejection of all of Tooher's testimony and part of Liguori's testimony, which ultimately led it to reopen the evidence to allow the parties to agree on a value or to revisit the applicable discount rate.

B

The plaintiff's second argument relating to her claim that the court erred in accepting the testimony of Murray is that Murray was not qualified as a real estate appraiser and he had not calculated the value of the plaintiff's remainder interest using a relevant discount rate. We agree with the plaintiff that the court should not have determined that one of the discount rates proposed by Murray for insertion into the Keating formula was appropriate.

The following additional facts are relevant to this claim. At the time of his testimony, Murray was a senior manager at the accounting firm of Blum, Shapiro & Co., P.C., who specialized primarily in business valuation. He was a licensed certified public accountant, an accredited business valuator, and an accredited senior appraiser of the American Society of Appraisers. He also was certified in financial forensics by the American Institute of Certified Public Accountants. In support of his testimony, Murray also submitted a written report, which was admitted into evidence. Attached to Murray's report was a list of his specializations, which included matrimonial disputes and estate and gift tax reporting, as well as a list of articles that he had authored or co-authored. Although he was not a real estate appraiser, Murray indicated that he valued intangible assets on a regular basis. However, although he had valued remainder interests in life estates, the making of such valuations was not listed as one of his areas of expertise

on his firm's website. Furthermore, Murray had never testified about the valuation of a remainder interest in real property until his testimony in the present case.

Prior to the commencement of Murray's testimony, the plaintiff objected to his qualifications and to the relevance of his testimony, arguing that the two discount rates he had chosen were related to entirely different investments and had never been accepted as proper tools for determining discount rates applicable to the appraisal of remainder interests in real property. The court overruled the plaintiff's objection.

As explained in his report, Murray accepted the present fair market value of the property calculated by Liguori, $1,280,000. He explained that the Keating method of valuation is a common method used to calculate the value of a remainder interest. Under this method, he explained, "a future expected value of the property is estimated based on (1) the current value of the underlying property, and (2) a growth assumption over the expected life of the life tenant. The estimated future value is discounted back to present value based on risk of the underlying property." Murray then analyzed Liguori's calculation. First, he noted that Liguori had used a figure of 12.1 years, instead of the correct figure of 11.1 years, as the life expectancy of the life tenant, Sandolo. This error produced an incorrect expected future value of the property encumbered by the life estate, which formed the basis for Liguori's calculation of the plaintiff's remainder interest. Murray then indicated that his own use of the correct life expectancy of 11.1 years in the calculation yielded an expected future value of the property at the time of the life tenant's death $1,594,764.

With respect to the discount rate, Murray opined that Liguori had erred in his calculation. Specifically, Murray opined that Liguori had used an unsupported discount rate that was not realistic; he also noted that Liguori had failed to include any empirical evidence supporting his choice of a 10 percent discount rate, notwithstanding the fact that the example presented in the Keating article had used a 10 percent discount rate. In his written report, Murray wrote: "It is unlikely that this property could achieve a 10 percent return. Mr. Liguori concluded on a value of the residence of $1,280,000. In addition . . . Liguori's property appraisal indicates that [the] property taxes are $16,724 per year. In order for this property to achieve a 10 percent return, the property would need to generate monthly rent of $14,194." Murray then noted that because the life tenant has the right to use and occupy a parcel of real estate for the duration of his or her life, a life estate is comparable to a tenancy arrangement in a single-family home, which produces an income stream in the form of rent. He noted that the risk, therefore, should be measured in terms of the risk of an income stream produced by

the rental of a single-family home. In connection with his expert analysis of the property, Murray had researched real estate rental listings of single-family homes available for rent in Stamford and had concluded that an average of $9,317.00 per month was a more realistic monthly rent for similar sized, single-family homes in Stamford. Although Murray used his discussion of a more appropriate rent value for the property to undermine Liguori's analysis, we note that he did not proceed, as Keating suggested in his article, to evaluate the present value of Sandolo's life estate on the basis of its market rental value over her life expectancy, which then would have to be discounted to present value.[21]

As previously noted, over the plaintiff's objection, the trial court permitted Murray to testify about discount rates that potentially applied to the value of the plaintiff's remainder interest. Murray inserted two of his discount rate selections into the Keating formula to arrive at two alternate valuations significantly higher than the values testified to by Liguori and Tooher. One of these rates, the Applicable Federal Rate (AFR), which the court adopted, was identified by Murray as a "rate . . . used for debt instruments that don't have stated interest rates [by the IRS]. So, usually, it's used if there's a related party transaction and they need to apply an interest rate . . . ." The AFR, available on the IRS website, is used by the IRS to impute an interest rate to a family loan transaction where one is not stated, and at the time of trial, it was 3.37 percent.[22] When the defendant's counsel asked Murray whether the IRS used the AFR to evaluate the value of a remainder interest, the plaintiff objected, claiming that there is "zero connection" between the imputed rate on family loans and the evaluation of a remainder interest in residential real estate. The court sustained the objection.[23] Murray then admitted that although he had read the Keating article, he did not know the basis for his application of the 10 percent discount rate back in 1998. He also admitted that there was no market for a remainder interest in a life estate.

The plaintiff recalled Liguori to dispute the applicability of the discount rates cited by Murray due to the limited liquidity of a remainder interest. Liguori testified that "[a] remainder interest is a very narrow buyer's market. You can't advertise this on a multiple listing. People are not going to come and buy this house because it's going to be tied up for twelve, twenty years, or however many years. You can't use the house. There's no tangible working model that you can do with it except wait."

The plaintiff also asked Liguori to explain to the court if he had arrived at his discount rate of 10 percent by other means, apart from reading it in the hypothetical discussed in Keating's article. Liguori attempted to

explain that because one has very little opportunity to exercise any property rights in a remainder interest until the life tenant dies, investment in a remainder interest entails high risk, unlike the investments that Murray referenced in calculating his recommended discount rates: loaning money at interest or purchasing an investment in a real estate investment trust. Liguori also explained in this testimony that one cannot finance a remainder interest at a regular rate and can only finance it at a higher rate because one cannot occupy the property, sell it, or liquefy it quickly. As a result, Liguori explained, if a party wanted to buy the plaintiff's remainder interest, it would want to purchase the house for much less than its fair market value because it might have to wait for a significant time to exercise property rights.[24]

The court, however, still was not persuaded by Liguori's explanation of how he had arrived at a 10 percent discount rate, which he called a conservative estimate in light of the range of investment risks between a low risk of 1 percent on a Treasury bill and a high risk of 30 percent for a developer building homes. Again, Liguori was unable to fully explain a precise method by which to calculate a discount rate pertaining to a remainder interest valuation. Furthermore, he was unable to specify, to the court's satisfaction, a currently accepted discount rate that was based on market conditions, property type, or the expected date of the life tenant's death. Liguori did not establish persuasively the derivation of a higher discount rate by any specific formulation, as suggested in the Keating article, and the court again rejected his adherence to a 10 percent discount rate. Instead, the court accepted the discount rate proposed by Murray, which was based on the AFR, the rate applied to related party loan transactions. Despite the fact that the plaintiff has little prospect for accessing the value of her remainder interest in the property for the period of Sandolo's actuarial lifespan, the court found the present value of the plaintiff's remainder interest to be $1,103,806 against a current fair market value of $1,280,000, which was greater than 86 percent of its actual fair market value.

As previously noted, we agree that it was proper for the court to reject the testimonial assertions of Liguori and Tooher as unpersuasive due to their inability to explain the derivation of the formulas that they used in their proposed methodologies. We also conclude, however, that the court, in placing a value on the plaintiff's remainder interest, erroneously relied on Murray's testimony because it did not properly apply the Keating methodology, which the court specifically had adopted.

The court indicated that it had *accepted* the Keating methodology, which proposed calculating a discount rate on the basis of several factors.[25] In his article, Keating explained that "[f]orecasting a future value and

then discounting it back to present value again may seem illogical, especially when current value is already known.[26] But the procedure is necessary, however, as the current value of the property is an unencumbered value, and the appraisal assignment is to estimate the value of a property encumbered by a life estate. The applicable discount rate is a function of the property type, market conditions and the expected date of death." (Footnote added.) Keating's article, unfortunately, did not give any formulaic basis for his determination of the appropriate discount rate, or describe how, in his hypothetical, he had arrived at a 10 percent discount rate.[27] The article also suggested a methodology for valuing the interest of the life tenant, and it was this discussion to which Murray only partially alluded in his report. After calculating the value of the remainder interest in his hypothetical, Keating also calculated the value of the life tenant's estate by using the market rent for the home occupied by the tenant. He then noted that if market rents were forecast to increase at a rate of 3 percent per year over the remainder of the expected life of the life tenant, the value of her interest at the same 10 percent discount rate could be calculated. With this calculation in his hypothetical, Keating produced a value for the life tenant's interest that could be added to the value of the remainderman's interest and result in a total amount that would be nearly equivalent to the present fair market value of the home. Murray never engaged in this latter exercise of calculating the value of the estate of the life tenant, Sandolo, despite spending a considerable amount of time discussing how much rent Sandolo would be paying if the home was rented to her at market rates. Therefore, we are unable to perceive how the court properly could have concluded that the discount rate applied by Murray would have achieved results consistent with the hypothetical in the Keating article. We reach this conclusion, as we are unable to determine if the discounted present value of Sandolo's life estate interest, based on the employment of market rental rates over the next 11.1 years, together with the value of the plaintiff's remainder interest proposed by Murray, would have been approximately equivalent to the present fair market value of the home.

In light of Murray's opinion that there is no market for investment in remainder interests, we agree with the plaintiff that Murray's use of discount rates applicable to low risk investments had no relation to a high risk investment like the purchase of a remainder interest, nor were they mentioned as proper discount rates for the appraisal of either a life estate or remainder interest in Keating's methodology, which the court accepted as proper.

We are mindful that "the trial court need not necessarily specify a valuation method used. Nor is the court required to set forth specific factors that were considered in arriving at that determination." *South Farms*

*Associates Ltd. Partnership* v. *Burns*, 35 Conn. App. 9, 18, 644 A.2d 940, cert. denied, 231 Conn. 912, 648 A.2d 157 (1994). Here, however, the court indicated that it was employing Keating's approach to valuation, an approach with which neither Liguori nor Murray took issue. The question, therefore, is not whether the court utilized a correct approach to valuation, but whether the court's determination of value in using the Keating approach was clearly erroneous.

We reiterate that "[i]n selecting and applying an appropriate valuation method, the trial court has considerable discretion. . . . The trial court's findings will be overturned only if it misapplies, overlooks, or gives a wrong or improper effect to any test or consideration which it was [its] duty to regard." (Citation omitted; internal quotation marks omitted.) *Bornemann* v. *Bornemann*, supra, 245 Conn. 532. We conclude that the court, in the face of three divergent explanations of valuation, lost sight of the rationale underlying Keating's proposed methodology, which it indicated that it had accepted, and veered into an unfounded comparison between returns on common, low risk investments and the return on a less common, higher risk investment in a remainder interest in real property. "Although the court has leeway in determining the value of assets in a marital dissolution, a market value approach to valuation, nevertheless, necessarily requires an examination of the marketability of the asset being appraised." *Brooks* v. *Brooks*, 121 Conn. App. 659, 668, 997 A.2d 504 (2010).

In the present case, both Liguori and Murray agreed that the marketability of the plaintiff's remainder interest was practically nil, so long as the life estate interest remained vested in Sandolo, yet the court, on the basis of Murray's testimony, ascribed a value to it that was the near equivalent of the real property's present fair market value. The court failed to examine and draw necessary conclusions regarding the amount that a willing buyer would pay for the plaintiff's remainder interest in the property. Thus, on the basis of the entire evidence presented as to the valuation of a remainder interest, we, as the reviewing court, are "left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *St. Joseph's Living Center, Inc.* v. *Windham*, 290 Conn. 695, 707, 966 A.2d 188 (2009).

The judgment is reversed only as to the court's financial orders and the case is remanded to the trial court for further proceedings, consistent with this opinion, with respect to the enforceability of the parties' agreement with the plaintiff's mother and with respect to all of the court's financial orders. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] On the basis of our conclusion that the court must reconsider all financial

orders as a result of the error it committed in determining the value of the plaintiff's remainder interest in the property she owned but in which her mother, Marianna Sandolo, retained a life estate, we need not reach the plaintiff's final claim regarding the award of lump sum alimony.

[2] In *Mensah* v. *Mensah*, supra, 145 Conn. App. 645–46, this court held that a trial court's orders with respect to alimony, child support, and the division of the marital estate lacked the requisite evidentiary basis and could not stand, as the trial court did not have sufficient financial information from the parties to issue fair and equitable dissolution orders. The trial court entered financial orders even though it expressly had found that the parties had failed to produce requisite discovery information as to the amount and sources of their income, the value of the wife's pension plan, or the defendant's businesses. Id., 647–48. The lesson in *Mensah* is that a court needs proper financial information to enter orders that are not based on speculation and conjecture. Id., 653.

[3] Subsequent to the filing of this appeal, the plaintiff sought an articulation from the trial court. In its articulation dated August 14, 2014, the court explained that "[a]fter the evidence was closed, the court remained unconvinced that the appropriate discount rate had been applied, [so it] visited a website simply to check the historical [Internal Revenue Service] discount rate. After doing so, and in light of the recently decided case of *Mensah* v. *Mensah*, supra, 145 Conn. App. 644 . . . the court determined that it needed additional evidence, and called the parties back to court, reopened the evidence and gave each an opportunity to present further expert testimony limited to the calculation of the appropriate discount rate and the valuation of the remainder interest. The [defendant] chose to do so, but the [plaintiff] declined, relying on the previous testimony."

[4] Vested remainder interests that have an ascertainable, actual value may be considered as an interest in fashioning marital dissolution orders. See *Dietter* v. *Dietter*, 54 Conn. App. 481, 502–503, 737 A.2d 926 ("In the present case, the trial court made no finding as to the actual value of the plaintiff's remainder interest in the terminated trust. On remand, if the trial court is able to ascertain the value of the plaintiff's interest, it may consider this interest in fashioning the financial orders. If, on the other hand, the trial court cannot make a proper valuation of the plaintiff's interest and in its discretion it awards alimony, it may fashion the decree to allow for modification of the award when the value of the interest becomes ascertainable."), cert. denied, 252 Conn. 906, 743 A.2d 617 (1999). If a court concludes that proper valuation of an asset, such as an inheritance, cannot occur until a later time, after the occurrence of some contingency, it may "postpone consideration of the inheritance until such time as its value could be ascertained with reasonable certainty." *Bartlett* v. *Bartlett*, 220 Conn. 372, 384, 599 A.2d 14 (1991).

[5] This court has stated: "The trial court may award alimony to a party even if that party does not seek it and has waived all claims for alimony." *Lord* v. *Lord*, 44 Conn. App. 370, 374, 689 A.2d 509, cert. denied, 241 Conn. 913, 696 A.2d 985 (1997), cert. denied, 522 U.S. 1122, 118 S. Ct. 1065, 140 L. Ed. 2d 125 (1998).

[6] Assuming Sandolo survived the period of her full life expectancy of 11.1 years, the plaintiff may have been obligated to pay this lump sum alimony in full, at a rate of $22,500 per year before a full possessory fee simple title to the property—which would then be worth its full market value—reverted to her. The court attributed earnings to the plaintiff of approximately $50,000 per year, but her financial affidavit reflected a weekly net income of $737, or $38,324 annually.

[7] Although the plaintiff filed an appeal from both the judgment of dissolution and the denial of her motion to reargue, she did not raise any issue regarding the denial of her motion to reargue in her preliminary statement of issues and has not briefed any claims involving it. We therefore deem that claim abandoned. See *Hanover Ins. Co.* v. *Fireman's Fund Ins. Co.*, 217 Conn. 340, 343 n.4, 586 A.2d 567 (1991).

[8] This portion of the articulation failed to resolve inconsistencies in the court's original memorandum of decision. As noted previously in this opinion, after discussing the deficiencies of the agreement with respect to enforcing it against the defendant, the court indicated that it need not abrogate it, but that it would resolve the family dispute by "alternate means to achieve an equitable resolution . . . ." Later in that same decision, however, the court declared paragraph 3 of the agreement void as against public policy and unenforceable against the defendant. As we will discuss further in part I of this opinion, in treating the plaintiff's remainder interest as a marital

asset for purposes of distribution of the marital property, the court effectively declined to enforce paragraph 3 of the agreement, wherein the defendant promised not to seek to have the plaintiff's interest in the property treated as a marital asset in the event of a dissolution of the parties' marriage.

[9] The court also indicated that it did not "consider the timing of when the parties occupied 85 Doolittle Road, which according to some testimony occurred as early as 2005, to be a critical factor in its decision, since it did not award the [defendant] a share of the real property." Furthermore, the court stated that its reasoning for awarding the defendant lump sum alimony equal to 20 percent of the value of the plaintiff's remainder interest was clearly set forth in its original memorandum of decision and needed no further articulation.

[10] As previously noted, in its articulation, the court denied that it had intended to declare the agreement unenforceable.

[11] Paragraph 1 of the agreement specifically states that the consideration for the donative transfer of the remainder interest to the plaintiff was the defendant's waiver in paragraph 3. Nowhere in the agreement is there any indication of what consideration the plaintiff gave to the defendant in exchange for his waiver.

[12] The court, having ultimately treated the agreement as unenforceable as to the defendant, could have then considered the possible alternative that the defendant be awarded a share of the remainder interest in the property, rather than lump sum alimony. The court unnecessarily precluded this alternative from consideration.

[13] The plaintiff also claims on appeal that the order of lump sum alimony, payable in $25,000 annual installments, was excessive in light of her income, making it more likely that she would need to utilize the remainder interest asset to satisfy the obligation. We need not address this issue. See footnote 1 of this opinion.

[14] Sandolo, as the grantor, also promised to pay any gift taxes due, if any, in connection with the transaction.

[15] "Even if neither party's pleading or proof reveals the [public policy] contravention, the court may ordinarily inquire into it and decide the case on the basis of it if it finds it just to do so . . . ." 2 Restatement (Second), Contracts, c. 8, topic 1, introductory note, p. 5 (1981).

[16] Additionally, among the issues the court may choose to consider on remand is whether Sandolo should be included as a necessary party. Under Connecticut law, "[n]ecessary parties . . . are those [p]ersons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it. . . . [B]ut if their interests are separable from those of the parties before the court, so that the court can proceed to a decree, and do complete and final justice, without affecting other persons not before the court, the latter are not indispensable parties." (Internal quotation marks omitted.) *In re Devon B.*, 264 Conn. 572, 579–80, 825 A.2d 127 (2003). Indispensable parties have been described as persons whose "interest in the controversy is such that a final decree cannot be made without either affecting that interest or leaving the controversy in such condition that its final disposition may be inconsistent with equity and good conscience. . . . Joinder of indispensable parties is mandated because due process principles make it essential that [such parties] be given notice and an opportunity to protect [their] interests by making [them] a party to the [action]." (Citations omitted; internal quotation marks omitted.) *Hilton* v. *New Haven*, 233 Conn. 701, 723, 661 A.2d 973 (1995).

In the present case, the trial court noted that, despite its ruling, Sandolo might, in the future, seek to "undo the transfer should the court void the [defendant's waiver]," an acknowledgment that its effort to avoid the issue of the agreement's unenforceability might still lead to "the protracted, contentious, and acrimonious litigation" the court was seeking to avoid. Sandolo may be entitled to some form of restitution should the agreement be declared unenforceable. In *Gaudio* v. *Gaudio*, 23 Conn. App. 287, 293–94, 580 A.2d 1212, cert. denied, 217 Conn. 803, 584 A.2d 471 (1990), this court approved the joinder or intervention of third parties as permissible where third parties had claimed an interest in property involved in the proceedings. "The policy supporting this view is the desirability of avoiding multiple suits and of granting complete relief in a single proceeding." Id., 293.

[17] Although we have briefly discussed some of the issues that the court may choose to consider when it evaluates the agreement at issue on remand, nothing in our discussion is meant to suggest an outcome with respect to

that inquiry, or to limit the issues that the parties may raise or that the court may consider with respect to the enforceability of the agreement.

[18] We observe that the court also was careful not simply to use the information it had obtained on discount rates from Internet research that it had conducted on its own, which would have been improper as not having been part of the trial evidence. See *Abington Ltd. Partnership* v. *Heublein*, 246 Conn. 815, 819, 717 A.2d 1232 (1998) (independent investigation of facts of case not shown to be improper under Code of Judicial Conduct, canon 3 [a] [4] [now rule 2.9 (a)] if information gleaned did not influence court's decision).

[19] The court did not insert any evidence which was outside the record. It questioned and rejected Liguori's discount rate, the deficiency of which was evident to the court during the defendant's cross-examination, and ultimately, it accepted one of the discount rates testified to by Murray. It should not have come as a surprise to the plaintiff that the discount rate proffered by her expert was suspect, yet by recalling Liguori as a witness, the plaintiff chose to persist in maintaining, after the evidence was reopened, that Liguori's discount rate was appropriate because his rate resulted in the lowest valuation of her interest. The court, however, did not find Liguori's defense of his 10 percent rate persuasive.

[20] We observe that none of the expert witnesses considered, at the time of their valuations, the fact that there was approximately a $100,000 mortgage on the property.

[21] We note that Liguori also did not attempt to calculate the value of Sandolo's life estate on the basis of its market rental value over her life expectancy.

[22] The other rate that Murray used concerned the ten year historical performance for Real Estate Investment Trusts (REITs), which are securities that invest in income producing property. This rate was 4.72 percent. Although Murray conceded that there was an obvious and stark qualitative difference between the plaintiff's remainder interest and an investment in a REIT, he nevertheless used the rate applicable to REITs. Murray indicated that unlike a REIT, a remainder interest in residential real estate such as the plaintiff's has no market; a remainder interest cannot be readily purchased or sold.

[23] In fact, the IRS promulgates a table on its website that specifically applies to the valuation of life estates and remainder interests for gift tax purposes. Pursuant to the Internal Revenue Code, 26 U.S.C. § 7520 (2012), the interest rate used to make this value calculation for a particular month is the rate that is 120 percent of the applicable federal midterm rate (compounded annually) for the month in which the valuation date falls. That rate is then rounded to the nearest two-tenths of 1 percent. The IRS has a publication, "Actuarial Valuations," describing the methodology, which can be accessed online. See Internal Revenue Service, "Actuarial Valuations–Version 3A," (last modified May, 2009), pp. 2–11, available at www.irs.gov/pub/irs-pdf/p1457.pdf (last visited March, 16, 2016) (copy contained in the file of this case in the Appellate Court clerk's office). The methodology is also used in bankruptcy proceedings to calculate the value of a remainder interest in real property. See P. Scribner, "How to Calculate the Value of a Remainder Interest in Bankruptcy," (March 8, 2011), available at http://www.scribnerbankruptcyblog.com (see archives for March, 2011) (last visited March, 16, 2016) (copy contained in the file of this case in the Appellate Court clerk's office).

[24] Liguori and Murray, therefore, did not dispute the limited marketability of life estate and remainder interests. One commentator has observed: "If one buys a life estate from the fee owner (or is given it, as is more often the case), the value one pays (or realizes, if it's a gift) is more or less the value of the use of the property for the expected life of the buyer (recipient). The value left to the seller (grantor), whose title is now described as a reversion, is the rest—or, to put it another way, the value of the reversion is the expected value of the fee simple title at the expected time of death of the life tenant, revised to present value. These values are, of course, speculative. They could change due to those vicissitudes of the market and the actions of the life tenant, but they also could change substantially depending on the actual length of the life of the life tenant. These multiple uncertainties affecting the value of the life estate and of the reversion are the main reason why very few people actually purchase a life estate in real property and those who do will typically pay much less than the actuarial tables and use value of the property would suggest the property is worth.

"When a life tenant dies, the remainderman's interest in the property increases in value. One could think of the increase in value as having been

incremental—as the life tenant gets closer to the day of her death, the value of the remainder increases day to day. One could also think of the increase as sudden—the remainderman's interest is difficult to sell and would only sell at a significant discount before the death of the life tenant. Once the life tenant dies, the remainderman owns the present possessory fee simple title to the property, which is then worth the full market value." (Footnotes omitted.) K. Salzberg, "Zombie Life Estates, Ghost Value Transfers, and Phantom Takings: Confusions of Title and Value in Property Law Legislation," 22 Quinnipiac Prob. L.J. 363, 375–76 (2009).

[25] A review of relevant case law discussing the valuation of life estates and remainder interests indicates that there is no single accepted way of valuing these limited interests in property. See 51 Am. Jur. 2d, Life Tenants and Remaindermen § 31 (1970) ("[i]t has been stated that in some states there is no fixed rule for estimating the value of a life estate, and that each case must be determined upon its own facts with the end in view of arriving at an equitable and just valuation"). We have found no Connecticut appellate authority that has expressly sanctioned the use of any particular method for valuation of limited property interests such as life estate and remainder interests. Such interests are frequently valued by consulting tables promulgated for taxation purposes. See, e.g., General Statutes § 12-353 ("The value of each future, contingent or limited estate, income interest or annuity for life or lives in being shall, so far as possible, be determined by the rule, method and standard of mortality and of value set forth in the Commissioners' 1980 Standard Ordinary Mortality Table with interest at six per cent per annum. The value of the interest remaining after such limited estate shall be determined by deducting the computed value of the limited estate from the value of the entire property in which such interest exists."); see also *Gregg* v. *Gregg*, 510 A.2d 474, 481 (Del. 1986) (possible to place present value on remainder interest in property subject to life estate pursuant to table referenced in state department of finance, division of revenue tax ruling); *In re Estate of Hjersted*, 285 Kan. 559, 585, 175 P.3d 810 (2008) (value of life estate interest owner's share of proceeds from sale of property calculated using "7520 rate" for date of sale pursuant to standardized valuation tables promulgated pursuant to 26 U.S.C. § 7520 [2000]). Actuarial tables also are used by social services departments to assess an individual's ability to pay for long-term medical care. See, e.g., *State* v. *Goggin*, 208 Conn. 606, 618, 546 A.2d 250 (1988) (alleged value of life estate, when conveyed, determined according to specified Department of Income Maintenance regulations); *Indiana Family & Social Services Administration* v. *Meyer*, 927 N.E.2d 367, 368–69 (Ind. 2010) (remainder interest in farm valued pursuant to state family and social services administration guidelines); *Hansen* v. *Hansen*, 774 N.W.2d 462, 464 (S.D. 2009) (couple's remainder interest in life estate calculated by using actuarial table used by state department of social services).

[26] The court, in fact, expressed at one point that it was baffled by the fact that the property was estimated to rise in value at the rate of 2 percent a year, while it was also being discounted to present value using a 10 percent rate. Specifically, the court stated: "How is it that you assume a growth rate of 2 percent going forward to arrive at the day, at a value where, you know, [Sandolo] goes to her reward? And then, take the present value using a 10 percent [discount rate]; I mean, why isn't, you know, why is it growing 2 percent this way and declining [10] percent the other way? It just doesn't— I'm puzzled by that."

[27] We note that none of the experts who testified indicated that he had read Keating's book, from which the article was excerpted.