******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

GREAT COUNTRY BANK ET AL. *v.* JEFFREY
OGALIN ET AL.
(AC 37905)

DiPentima, C. J., and Keller and Prescott, Js.

*Argued April 11—officially released October 11, 2016*

(Appeal from Superior Court, judicial district of

Fairfield, Kamp, J.)

*Roy W. Moss*, for the appellant (Drywall Construction Corporation of Connecticut, Inc.).

*Paul N. Gilmore*, with whom, on the brief, was *Christopher A. Klepps*, for the appellee (substitute plaintiff).

*Opinion*

KELLER, J. In this foreclosure action, a third party, Drywall Construction Corporation of Connecticut, Inc. (Drywall), appeals from the judgment of the trial court awarding the plaintiff Cadle Company a turnover order in the amount of $19,887.27 to aid in the execution of a deficiency judgment rendered against the defendant Frank Ogalin, Jr.[1] Drywall claims that (1) the court erroneously found that, as of the date on which the plaintiff served a property execution on Drywall, it owed the defendant unreimbursed business expenses, and (2) even if the court properly found that it owed the defendant unreimbursed business expenses, it improperly awarded the plaintiff a turnover order because the expenses at issue constituted earnings for personal services, which are not the proper subject of a property execution. We affirm the judgment of the trial court.

The relevant procedural history may be summarized as follows. In 1994, following a foreclosure by sale, the named plaintiff, Great Country Bank, obtained a deficiency judgment against the defendant. Later, Great Country Bank assigned its interest in the deficiency judgment to the plaintiff. In 2013, the plaintiff conducted postjudgment discovery and concluded that Drywall, a closely held family business, was in possession of debts that were due and owing to the defendant, one of its employees. In December, 2013, pursuant to General Statutes (Rev. to 2013) § 52-356a (a) (1),[2] the plaintiff served on Drywall a personal property execution in an attempt to collect on the unsatisfied judgment. Drywall refused this demand for payment.

In 2014, the plaintiff sought a turnover order against Drywall. It filed an application for orders in aid of execution pursuant to General Statutes § 52-356b[3] and a claim for a determination of interests in the subject property pursuant to General Statutes § 52-356c.[4] It is not in dispute that Drywall was served with the application and claim. The court summoned Drywall to appear at a hearing on these matters, which took place over the course of three days, September 4, 2014, October 2, 2014, and November 5, 2014.[5] During the hearing, the plaintiff presented documentary evidence and testimony from Christina Ogalin (Ogalin), who is both Drywall's president and the defendant's daughter. Following the hearing, both the plaintiff and Drywall submitted posttrial briefs. Essentially, the plaintiff argued that the evidence, which included business records of Drywall, demonstrated that Drywall owed the defendant unreimbursed business expenses that he incurred on Drywall's behalf. Drywall, arguing that the evidence demonstrated that it had reimbursed the defendant for prior expenses and that not all of the expenses in evidence had been incurred by the defendant, contended that it did not owe the defendant any

"significant obligation" in December, 2013, when the property execution was served on Drywall.

In relevant part, the court stated the following in its memorandum of decision: "During the hearing on the plaintiff's application, the only witness was [Ogalin], who testified in her capacity as president of Drywall. Her testimony largely focused on the creation of four manila envelopes that were marked as the plaintiff's exhibits 3, 4, 5, and 6. On the outside of each of these exhibits, Ogalin had written in red ink, in three separate columns, the amount of the expense, the date the expense was incurred, and the vendor to whom the expense was paid. Contained within each envelope [were] the expense receipt[s] . . . itemized on the face of the envelope. It was estimated that among all four envelopes, more than 700 individual expenses were itemized. The court finds that Drywall's accounting and record keeping practices were sloppy at best and performed in a manner that defies even basic accounting standards.

"On October 29, 2013, Ogalin was deposed by the plaintiff in postjudgment proceedings. During that deposition, the following colloquy took place:

" 'Q. And all of these . . . receipts . . . in these four folders that are exhibits 3, 4, 5, and 6 and the front pages, that represents obligations owing from [Drywall] to [the defendant]?

" 'A. Yes. All this will be owed. If not already paid, some.' . . .

"On March 13, 2014, in her continued deposition, Ogalin testified as follows with regard to the creation of the envelopes:

" 'Q. You testified a couple of minutes ago that you never wrote the first check for expense reimbursement concerning a document, such as an exhibit, which is now exhibit 9, until the front face of the document was complete.

" 'A. I normally would generate the receipts and have a total on the manila [envelope], and from that total would write out checks when the business had money, and then that total would be wiped out once I hit that total. And then would go to the next manila [envelope] and next manila [envelope] and so on. Everything has been paid and accounted for but, like I said, that would be an amount, and that's how I would do it. . . .'

"During the hearing on the plaintiff's application, Ogalin testified contrary to her prior sworn deposition testimony. Most significantly, she claimed [at the hearing] that all the expenses had been reimbursed *prior* to her creating the manila envelopes, not before. In addition, it was her testimony that the expenses were not incurred by the defendant alone. Rather, they were expenses incurred by her brother [Frank F. Ogalin III],

who is also an officer in the corporation, as well as herself and [the defendant]. There was also conflicting testimony as to how those receipts were maintained. At one point, Ogalin testified that receipts were kept in separate bags depending upon who incurred the expense. There was also testimony that all the receipts were comingled, regardless of who incurred the expense. Again, as the court noted previously, the accounting and record keeping methods employed by Ogalin and Drywall were so poor that it is almost impossible to place any credibility in their accuracy.

"After [posttrial] litigation [had] commenced, Ogalin attempted to create a spreadsheet in which she allocated each individual expense to either herself, [the defendant], or [Frank Ogalin III]. The court does not find this testimony credible. First, when deposed, Ogalin made clear that she only issued reimbursement after she totaled the expenses on the outside of each envelope and knew the aggregate total of those expenses. Such a process would be the logical method of issuing reimbursement, as one would need to know how much needs to be reimbursed before issuing any payment. To now claim that payments were made to reimburse expenses before the actual value of those expenses was determined is not logical [or] credible. Moreover, to now assert that these expenses were comingled expenses incurred by the defendant, [Frank Ogalin III], and herself also lacks credibility. [Ogalin] previously testified under oath that the receipts contained in these individual envelopes were expense reimbursements owed to the defendant alone. Her testimony, that in 2014 she created a spreadsheet allocating those expenses between three individuals, based on her memory of approximately 700 individual receipts from a multitude of different vendors, also lacks credibility. No individual is capable of recalling who incurred a specific expense out of all of the many individual expenses [at issue], some dating back as many as five years. . . .

"[W]hen the court evaluates the credibility of the testimony of Ogalin, scrutinizes all the exhibits, and considers the business practices of Drywall and its accounting methods, the court finds that as of December 3, 2013, the date of the plaintiff's property execution issued to Drywall, Drywall owed the defendant unreimbursed business expenses in the amount of $19,887.27. The court has reduced the total sum by those expenses not attributable to the business of Drywall.

"With regard to the plaintiff's claim of a $4300 loan repayment obligation due the defendant from Drywall, the plaintiff has not met its burden of proof that this was still owed to the defendant as of the date of the property execution. This portion of the turnover order is denied.

"For the foregoing reasons, the court grants the plain-

tiff's [application for a] turnover order in the amount of $19,887.27." (Emphasis in original.)

This appeal by Drywall followed. We will address each of Drywall's claims, in turn.

I

First, Drywall claims that the court erroneously found that, as of the date on which the plaintiff served the property execution on Drywall, it owed the defendant unreimbursed business expenses totaling $19,887.27. We disagree.

Drywall expressly invokes our clearly erroneous standard of review, which governs our review of the findings of fact made by the trial court. "It is the province of the trier of fact to weigh the evidence presented and determine the credibility and effect to be given the evidence. . . . On appellate review, therefore, we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . It is not within the power of this court to find facts or draw conclusions from primary facts found by the trial court. As an appellate court, we review the trial court's factual findings to ensure that they could have been found legally, logically and reasonably. . . . Appellate review under the clearly erroneous standard is a two-pronged inquiry: [W]e first determine whether there is evidence to support the finding. If not, the finding is clearly erroneous. Even if there is evidence to support it, however, a finding is clearly erroneous if in view of the evidence and pleadings in the whole record [this court] is left with the definite and firm conviction that a mistake has been committed." (Citations omitted; internal quotation marks omitted.) *Morgan Buildings & Spas, Inc.* v. *Dean's Stoves & Spas, Inc.*, 58 Conn. App. 560, 564, 753 A.2d 957 (2000).

In relevant part, Drywall argues: "The only witness presented by [the plaintiff], Drywall's president, [Ogalin], testified that Drywall owed the defendant nothing at the time of [the plaintiff's] levy. The documentary evidence fully supported and in no manner did it contradict Ogalin's testimony. This includes Ogalin's relevant deposition testimony, wherein [she] indicated nothing more than Drywall's general intention or practice of paying reimbursement to an employee, such as [the defendant] for actual business expenses incurred for Drywall's benefit." (Emphasis omitted.) Additionally, Drywall argues that the evidence did not support the court's reliance on receipts included in the envelopes, as there was no evidence that these envelopes, or the receipts therein, had "any specific connection to [the defendant]" or that the debts reflected therein were owed the defendant on the date of the execution or within the four months following the execution.[6]

We readily conclude that the evidence supports the trial court's finding that the four envelopes at the center

of its findings contained receipts for expenses incurred by the defendant on behalf of Drywall. Although, in the context of this claim, Drywall appears to rely entirely on Ogalin's testimony at the posttrial hearing, critical evidence in the present case came in the form of her *deposition* testimony, which was offered by the plaintiff and admitted into evidence for substantive purposes by the court without objection.[7] She was deposed, first, on October 29, 2013, and, later, on March 13, 2014, after the plaintiff served the property execution and filed an application for a turnover order against Drywall. In her deposition testimony of October 29, 2013, Ogalin stated that the envelopes contained receipts for unreimbursed expenses incurred by the defendant for Drywall. She testified at length with respect to the manner in which she recorded the expenses incurred by the defendant for Drywall, which included, among other things, food purchases, items used by workers and office supplies. She testified that she kept records at Drywall's place of business, which was located in a portion of her home. She testified that as the defendant provided her with receipts for his business expenditures, which were always cash expenditures, it was her procedure to place such receipts into a shopping bag that was dedicated to the defendant's expenditures. Ogalin testified that receipts for business expenditures incurred by Frank Ogalin III were stored in a separate shopping bag.

In her October 29, 2013 deposition testimony, Ogalin testified that, between 2011 and 2013, she removed receipts from the shopping bag dedicated to the defendant's unreimbursed expenses. Then, she engaged in a laborious process of itemizing the expenses by using four envelopes. Each envelope contained between 165 and 174 receipts. For each receipt, Ogalin recorded on the front of the envelope the name of the vendor, the date the expense was incurred, and the amount of the expense. Ogalin proceeded to testify that, once she was unable to fit any additional receipts into an envelope, it was her practice to create a total for all of the receipts in the envelope and to write that total on the outside of each envelope near the columns listing the individual expenses. Photocopies of the front of each of the four envelopes were introduced as exhibits both at the time of Ogalin's depositions and at the posttrial hearing. Added together, the four totals listed on the envelopes amount to $25,080.41.[8]

In addition to demonstrating that the envelopes and the receipts therein reflected business expenses incurred by the defendant on behalf of Drywall, the evidence supported a finding that these expenses were unreimbursed on December 3, 2013, when the property execution was served on Drywall. During her deposition testimony of October 29, 2013, which, obviously, preceded the execution, Ogalin was asked if the four envelopes represent obligations owed to the defendant by Drywall. She replied, "Yes. All this will be owed. If not

already paid, some."

In both her March 13, 2014 deposition testimony and her testimony at the time of the posttrial hearing, Ogalin testified that her process of totaling the receipts in the envelopes occurred *prior* to her making reimbursements for such expenses. She testified that reimbursements for the amount totaled on one envelope are completed *prior* to her making reimbursements for expenses reflected on another envelope.

Ogalin's testimony at the March 13, 2014 deposition, which occurred *after* the execution had been served and *after* the plaintiff applied for a turnover order, as well as her subsequent testimony at the posttrial hearing, differed in material ways from her original deposition testimony. Essentially, both in her later deposition and at the posttrial hearing, Ogalin testified that, upon her further review, the envelopes contained receipts that reflected her own expenses, not just those of the defendant, as well as obligations that had been paid. As is detailed in the court's discussion of Ogalin's testimony at the posttrial hearing, she testified that, after her initial deposition testimony, she created a spreadsheet in which, on the basis of her recollection of the hundreds of business expenses at issue, she reflected that many of the receipts at issue were her own expenses. Also, referring to specific reimbursements that had been made by Drywall prior to the execution, she testified that, prior to the creation of the envelopes, reimbursements had been made to the defendant for receipts in the envelopes.

For a variety of reasons, the court found that Ogalin did not testify credibly at the posttrial hearing. Although Drywall does not explicitly challenge the court's credibility determination, upon which the court's decision is based, its arguments concerning the evidence implicitly invite us to rely solely upon Ogalin's testimony at the posttrial hearing. It suffices to observe that in our review we need only look to whether the evidence supports the court's factual determinations; we will not relitigate the court's credibility findings because such determinations are wholly within the province of the court as the trier of fact.[9] See, e.g., *Somers* v. *Chan*, 110 Conn. App. 511, 530, 955 A.2d 667 (2008).

With respect to the precise amount of the court's turnover order, $19,887.27, we observe that the court stated that it had reached this final amount after it carefully evaluated Ogalin's testimony and all of the exhibits presented in evidence. As stated earlier, Ogalin's deposition testimony from October 29, 2013, as well as documentary evidence consistent therewith, supported a finding that, at the time of execution, Drywall owed the defendant business expenses in a higher amount, $25,080.41. The court did not set forth detailed findings with respect to how it arrived at its turnover order in the amount of $19,887.27, and the record does

not reflect that Drywall, which bears the burden of demonstrating that the trial court committed reversible error, asked the court to provide the manner by which it calculated the amount of the debt owed the defendant. As the plaintiff argues before this court, however, the evidence readily provides a rationale for the court's award. It is clear from our review of the court's decision that its award was directly based on its finding that, as of the date on which the plaintiff served a property execution on Drywall, it owed the defendant unreimbursed business expenses totaling $19,887.27. As stated previously in this opinion, "[o]n appellate review . . . we will give the evidence the most favorable reasonable construction in support of the verdict to which it is entitled. . . . It is not within the power of this court to find facts or draw conclusions from primary facts found by the trial court. As an appellate court, we review the trial court's factual findings to ensure that they could have been found legally, logically and reasonably." (Citation omitted; internal quotation marks omitted.) *Morgan Buildings & Spas, Inc.* v. *Dean's Stoves & Spas, Inc.*, supra, 58 Conn. App. 564.

In its decision, the court stated that it had determined the amount of its turnover order after it had "reduced the total sum by those expenses not attributable to the business of Drywall." In her initial deposition testimony in which she described the unreimbursed expenses detailed on the envelopes, Ogalin admitted that she had not reviewed the receipts contained in the envelopes for the purpose of determining whether they reflected valid business expenses because she believed that "many things could be for the company." At the time of the posttrial hearing, Ogalin testified with respect to the spreadsheet concerning the receipts which, as was discussed previously in this opinion, she prepared prior to the posttrial hearing. Although the court did not find this evidence and the testimony concerning it be credible insofar as it was introduced to demonstrate, for example, that expenses had been reimbursed or that certain expenses were not attributable to the defendant, it appears that the court found this testimony and evidence credible insofar as it was introduced to demonstrate that certain of the expenses at issue simply were not *business expenses* of Drywall. "[T]he trial judge . . . is free to accept or reject, in whole or in part, the testimony offered by either party." (Internal quotation marks omitted.) *Antonucci* v. *Antonucci*, 164 Conn. App. 95, 131, 138 A.3d 297 (2016).

The spreadsheet contained information concerning the receipts reflected on the envelopes. Referring to the spreadsheet, Ogalin testified that sixty-five of the expenses detailed thereon, totaling $3819.14, had been "rejected" by her because they were not business expenses of Drywall.[10] Deducting this $3819.14 from $25,080.41, the total amount reflected on the envelopes, results in $21,261.27, an amount that is $1374 *greater*

than the amount of the court's turnover order, $19,887.27. Thus, the evidence suggests that the court deducted the expenses that Drywall claimed were not attributed to its business and, to Drywall's benefit, awarded a turnover order in an amount that was lower than the total amount reflected on the envelopes minus such nonbusiness expenses.[11]

As the foregoing analysis reflects, there is evidence to support the court's findings and its turnover order. The plaintiff demonstrated that, at the time of the execution, Drywall held "nonexempt personal property of the judgment debtor other than debts due from a banking institution or earnings." General Statutes (Rev. to 2013) § 52-356a (a) (1).[12] Such debts are a proper subject of a turnover order. See General Statutes § 52-356b.[13] With respect to the court's findings, our review of the evidence and pleadings in the whole record does not leave us with the definite and firm conviction that a mistake has been committed. Accordingly, this claim is not persuasive.

## II

Next, Drywall claims that even if the court properly found that it owed the defendant unreimbursed business expenses, it improperly awarded the plaintiff a turnover order because the expenses at issue constituted earnings for personal services and, therefore, were not the proper subject of a property execution. We reject this claim.

Drywall observes that, under General Statutes (Rev. to 2013) § 52-356a (a) (1), the plaintiff was entitled to an execution "against the nonexempt personal property of the judgment debtor other than debts due from a banking institution or earnings. . . ." Moreover, Drywall observes that " '[e]arnings' " are defined by statute as "any debt accruing by reason of personal services, including any compensation payable by an employer to an employee for such personal services, whether denominated as wages, salary, commission, bonus or otherwise." General Statutes § 52-350a (5). Drywall argues that "assuming Drywall owed [the defendant] a debt by reason of expenses [he] incurred as an employee on behalf of [his employer], then the expenses were incurred by [the defendant], a fortiori, by reason of his performance of personal services, and therefore the debt owed comes squarely within the plain statutory definition of earnings." Drywall goes on to argue: "Where in the course of rendering personal services to an employer, an employee incurs substantial reimbursable expenses, the actual reimbursement of such expenses is conceptually similar to wages, [salary], bonuses, commissions, etc., and is . . . deserving of the protections of the statutory wage execution provisions." Thus, Drywall argues, "the alleged debt owed by Drywall to [the defendant] was not subject to ordinary property execution [and] it was error to enter the turn-

over order."

The plaintiff argues that there is no support in the law for Drywall's argument that any monies it owed the defendant for expenses that he incurred on Drywall's behalf should be characterized as wages for personal services. On a more fundamental level, however, the plaintiff argues that Drywall is not entitled to review of this claim because it was not raised before the trial court. We agree with the plaintiff.

The record reflects that, at no time during the proceedings before the trial court did Drywall argue or attempt to demonstrate that the expenses at issue were a form of wages owed the defendant for personal services; the factual issues were limited to whether the expenses were incurred by the defendant on behalf of Drywall, whether the expenses were unreimbursed at the time of the execution, and whether the expenses were business expenses. Before this court, Drywall, in a conclusory manner that is not supported by reference to relevant facts in the record, raises a factual issue that it did not ask the court to resolve expressly and which, unsurprisingly, the trial court did not address in its memorandum of decision.

We need not consider this claim. "Our appellate courts, as a general practice, will not review claims made for the first time on appeal. . . . [A]n appellate court is under no obligation to consider a claim that is not distinctly raised at the trial level. . . . [B]ecause our review is limited to matters in the record, we [also] will not address issues not decided by the trial court. . . . The purpose of our preservation requirements is to ensure fair notice of a party's claims to both the trial court and opposing parties. . . . These requirements are not simply formalities. They serve to alert the trial court to potential error while there is still time for the court to act." (Citations omitted; footnote omitted; internal quotation marks omitted.) *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 619–20, 99 A.3d 1079 (2014).

Alternatively, we observe that Drywall has failed to set forth any authority in support of the proposition that, on behalf of the defendant, it had standing to claim before the trial court that the debts at issue were exempt from execution because they constituted wages owed the defendant as compensation for personal services. The record reflects that the defendant and Drywall were served with the execution in accordance with § 52-356a, which included a notice of judgment debtor rights as required by General Statutes § 52-361b. The defendant, who is the judgment debtor in this proceeding, did not avail himself of his statutory right to claim an exemption on the ground that the execution was directed at wages, which were exempt from execution, by returning the exemption claim form to the clerk of the Superior Court.

For the foregoing reasons, we conclude that Drywall is unable to prevail with respect to this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] This foreclosure action was commenced by the named plaintiff, Great Country Bank, against the following defendants: Jeffrey T. Ogalin; Frank Ogalin, Jr.; the Federal Deposit Insurance Corporation, as receiver for the Bank Mart; the Internal Revenue Service of the United States of America; and Benson Snaider, P.C. Great Country Bank obtained a judgment of foreclosure, and later a deficiency judgment following the sale, then assigned its interest in the deficiency judgment to Cadle Company, which subsequently appeared as a plaintiff in this action. In this opinion, we shall refer to Cadle Company as the plaintiff, to Frank Ogalin, Jr., as the defendant, and to other individuals by name. The plaintiff and Drywall are the only parties that participated in this appeal.

[2] General Statutes (Rev. to 2013) § 52-356a (a) (1) provides in relevant part: "On application of a judgment creditor or a judgment creditor's attorney, stating that a judgment remains unsatisfied and the amount due thereon, and subject to the expiration of any stay of enforcement and expiration of any right of appeal, the clerk of the court in which the money judgment was rendered shall issue an execution pursuant to this section against the nonexempt personal property of the judgment debtor other than debts due from a banking institution or earnings. . . ."

[3] General Statutes § 52-356b provides: "(a) If a judgment is unsatisfied, the judgment creditor may apply to the court for an execution and an order in aid of the execution directing the judgment debtor, or any third person, to transfer to the levying officer either or both of the following: (1) Possession of specified personal property that is sought to be levied on; or (2) possession of documentary evidence of title to property of, or a debt owed to, the judgment debtor that is sought to be levied on.

"(b) The court may issue a turnover order pursuant to this section, after notice and hearing or as provided in subsection (c) of this section, on a showing of need for the order. If the order is to be directed against a third person, such person shall be notified of his right pursuant to section 52-356c to a determination of any interest claimed in the property.

"(c) The court may issue a turnover order against a judgment debtor, without notice or hearing, upon affidavit by the judgment creditor or another competent affiant stating facts from which the court concludes that there is a reasonable likelihood that the judgment debtor is about to remove the property from the state or is about to fraudulently dispose of the property with intent to hinder, delay or defraud his creditors. The court shall expeditiously hear and determine any motion by the judgment debtor to dissolve such an ex parte order.

"(d) Unless directed to a person who is before the court, any turnover order shall be personally served and shall contain a notice that failure to comply therewith may subject the person served to being held in contempt of court."

[4] General Statutes § 52-356c provides: "(a) Where a dispute exists between the judgment debtor or judgment creditor and a third person concerning an interest in personal property sought to be levied on, or where a third person claims that the execution will prejudice his superior interest therein, the judgment creditor or third person may, within twenty days of service of the execution or upon application by the judgment creditor for a turnover order, make a claim for determination of interests pursuant to this section.

"(b) The claim, which shall constitute the appearance of any third-person claimant, shall be filed with the Superior Court, on a prescribed form as a supplemental proceeding to the original action. The claim shall contain a description of the property in which an interest is claimed and a statement of the basis for the claim or of the nature of the dispute.

"(c) On filing of the claim, the clerk of the court shall assign the matter for hearing on a date certain and order that notice of the hearing be served by the claimant on all persons known to claim an interest in the disputed property.

"(d) Pending the hearing on the claim and subject to further order of the court, any property in dispute shall continue to be held by the person then in possession and shall not be transferred to any person who is not a party to the supplemental proceeding. If previously seized by or delivered to a levying officer, the property shall remain in the custody of the levying officer.

"(e) Unless the judgment creditor waives such rights as he may have to execute against the contested property, the claim shall be deemed controverted and the issues shall be joined without further pleading by any party. The court may permit or require such further pleadings, amendments and notices and may make such further orders as justice or orderly administration requires. Prior to hearing the claim, the court may in its discretion: (1) Require the judgment creditor to post a bond in favor of a third person claimant for any damages which may accrue as a result of the outstanding execution and any subsequent proceedings, (2) on substitution by the third person of a bond as security for the property, allow the third person to obtain release of the property pending determination of the claim, or (3) direct that other known nonexempt property of the judgment debtor first be executed against.

"(f) After hearing, the court shall render judgment determining the respective interests of the parties and may order the disposition of the property or its proceeds in accordance therewith.

"(g) This section does not affect any interest in property of any person who is not a party to a determination pursuant to the provisions of this section."

[5] We observe that Drywall, represented by counsel, appeared before the trial court as a "third party" and that it has brought the present appeal as a "third party." Drywall, which is not a party to the underlying action, nevertheless properly brings the present appeal because it indisputably was a party to the supplemental proceeding, initiated by the plaintiff under § 52-356c, in that original foreclosure action. General Statutes § 52-263 provides in relevant part: "Upon the trial of all matters of fact in any cause or action in the Superior Court, whether to the court or jury, or before any judge thereof when the jurisdiction of any action or proceeding is vested in him, if either party is aggrieved by the decision of the court or judge upon any question or questions of law arising in the trial . . . he may appeal to the court having jurisdiction from the final judgment of the court or of such judge . . . ." Our Supreme Court has observed that, for purposes of § 52-263, an underlying action encompasses judicial proceedings in a court of justice and "include *any proceeding* in such a court for the purpose of obtaining such redress as the law provides. . . . It includes not only the usual civil action instituted by process but also proceedings initiated by petition . . . stipulation . . . or motion." (Citation omitted; emphasis altered; internal quotation marks omitted.) *Board of Education* v. *Tavares Pediatric Center*, 276 Conn. 544, 554–55, 888 A.2d 65 (2006). Moreover, "[a]ny court decision on a determination of interest in property under section 52-356c . . . shall be a final decision for the purpose of appeal." General Statutes § 52-400d; see, e.g., *PB Real Estate, Inc.*, v. *Dem II Properties*, 50 Conn. App. 741, 742, 719 A.2d 73 (1998) (nonparty appealed from turnover order directed against it).

[6] See General Statutes (Rev. to 2013) § 52-356a (a) (4) (C) (ii) ("if a debt is not yet payable, payment shall be made when the debt matures if within four months after issuance of the execution").

[7] Section 8-5 of the Connecticut Code of Evidence provides in relevant part: "The following are not excluded by the hearsay rule, provided the declarant is available for cross-examination at trial:

"(1) A prior inconsistent statement of a witness, provided (A) the statement is in writing or otherwise recorded by audiotape, videotape or some other equally reliable medium, (B) the writing or recording is duly authenticated as that of the witness, and (C) the witness has personal knowledge of the contents of the statement . . . ."

[8] Each envelope reflected a different total. One envelope was marked with a total of $7603.37, another with a total of $5155.45, another with a total of $5920.05, and the final with a total of $6401.54.

[9] Insofar as Ogalin testified in a manner contrary to her initial deposition testimony, the court resolved such conflict in favor of the earlier deposition testimony. It suffices to observe that there were ample factors that supported the court's finding that Ogalin's later testimony, concerning debts owed from her family's business to the defendant, generally was not credible. The court explained that Ogalin's later deposition testimony and her posttrial testimony were not logical and likely had been influenced by the fact that they occurred after the posttrial litigation was initiated by the plaintiff. The court also explained why it did not credit as accurate the spreadsheet generated by Ogalin, by memory, after the commencement of the posttrial litigation. As the plaintiff correctly argues, Ogalin's testimony that Drywall had reimbursed the defendant for expenses that appear on the envelopes, and Drywall's attempt to demonstrate this by presenting evidence of pay-

ments that allegedly had been made to the defendant, was incompatible with the court's finding, supported by Ogalin's initial deposition testimony, that reimbursements were made by Drywall, if at all, only *after* Ogalin had prepared each envelope and had totaled the receipts contained therein. Thus, although there was testimony from Ogalin concerning several payments that had been made to the defendant by Drywall, the court did not rely on such evidence because many of these alleged payments predated the preparation of the envelopes that, according to Ogalin's testimony, contained the receipts for the expenses reimbursed to the defendant.

[10] In addition to Ogalin's testimony that these expenses were not business expenses of Drywall, we observe that the spreadsheet reflects that many of the expenses were incurred in retail stores, including but not limited to T.J. Maxx, Toys R Us, Perfume World, Champs, Old Navy, Game Stop, Macy's, Petco, American Eagle, Sephora, Hallmark, Kohl's, and Hollister. Consistent with Ogalin's testimony, it would have been reasonable for the court to have inferred that expenses incurred at such retail stores were unlikely to have been related to Drywall's construction business.

[11] The plaintiff argues, and we agree, that the court's further reduction of $1374 may be the result of the court having credited other evidence favorable to Drywall, including evidence presented at the posttrial hearing that on October 11, 2013, prior to the date on which the execution was served on Drywall, Drywall had reimbursed the defendant by check in the amount of $1274, for his purchase of "small tools and supplies." Ogalin, referring to a "Vendor Activity Report" that reflected payments made to the defendant, testified that such payment, for business expenses of Drywall, had been made to the defendant.

[12] See also footnote 2 of this opinion.

[13] See also footnote 3 of this opinion.

--------------------------------